**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )     **Civil Action No. 25-cv-34** |
| **APPROXIMATELY 1,467,761.163191 USDT,** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

**VERIFIED COMPLAINT FOR FORFEITURE _IN REM_**

Plaintiff, the United States of America, by and through the Assistant Attorney General for the National Security Division, brings this verified complaint for forfeiture in a civil action _in rem_ against approximately 1,467,761.163191 USDT, hereinafter the "Defendant Property," and alleges as follows:

**JURISDICTION AND VENUE**

1.     This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345, because it has been commenced by the United States, and by virtue of 28 U.S.C. § 1355(a), because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

2.     Venue is proper here under 18 U.S.C. § 3238 and 28 U.S.C. § 1395(a).

**STATUTORY AUTHORITY**

**Offense Statutes**

3.     This investigation relates to violations of 18 U.S.C. § 1028 (Identity theft), 18 U.S.C. § 1030 (Computer fraud and abuse), 18 U.S.C. § 1343 (Wire fraud), 18 U.S.C. § 1956 (Money laundering), and conspiracy to commit the foregoing offenses in violation of 18 U.S.C. §§ 371, 1349, and 1956(h).

1

4. **Identity theft:** 18 U.S.C. § 1028(a)(1) makes it a crime, *inter alia*, to knowingly and without lawful authority produce an identification document, authentication feature, or a false identification document. 18 U.S.C. § 1028(a)(7) makes it a crime, *inter alia*, to knowingly transfer, possess, or use, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law. The term "means of identification" is defined in 18 U.S.C. § 1028(d)(7) and includes, *inter alia*, name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number.

5. **Computer fraud and abuse:** 18 U.S.C. § 1030(a)(2)(C) makes it a crime, *inter alia*, to intentionally access a computer without authorization and thereby obtain information from any protected computer. 18 U.S.C. § 1030(a)(4) makes it a crime, *inter alia*, to knowingly and with intent to defraud, access a protected computer without authorization, and by means of such conduct further the intended fraud and obtain anything of value. The term "protected computer" is defined in 18 U.S.C. § 1030(e)(2) and includes, *inter alia*, a computer used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States. *See Van Buren v. United States*, 141 S. Ct. 1648, 1652 (2021) (definition of protected computer under 18 U.S.C. § 1030(e)(2)(B) includes "at a minimum . . . all computers that connect to the Internet").

6. 18 U.S.C. § 371 prohibits a conspiracy to commit an offense or to defraud the United States, including violations of 18 U.S.C. § 1028(a)(7) and 1030(a)(2).

7. **Wire fraud:** 18 U.S.C. § 1343 makes it a crime for anyone, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means

of false or fraudulent pretenses, representations, or promises, to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice. 18 U.S.C. § 1349 prohibits the attempt or conspiracy of a violation of 18 U.S.C. § 1343.

8.    **Money laundering:** 18 U.S.C. § 1956(a)(1)(B)(i) makes it a crime to conduct or attempt to conduct a financial transaction, knowing that the property involved in the transaction represents the proceeds of some form of unlawful activity, and which in fact involves the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. This offense is sometimes referred to as concealment money laundering.

9.    The term "specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1), and it includes violations of 18 U.S.C. § 1030 (Computer fraud and abuse) and 18 U.S.C. § 1343 (Wire fraud).

10.    18 U.S.C. § 1956(h) criminalizes a conspiracy to violate § 1956.

## Forfeiture Statutes

11.    Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from "proceeds" traceable to a violation of 18 U.S.C. § 1030 (Computer fraud and abuse), 18 U.S.C. § 1343 (Wire fraud), or a conspiracy to commit such offenses, is subject to criminal and civil forfeiture.

12.    Pursuant to 18 U.S.C. § 982(a)(1) and 18 U.S.C. § 981(a)(1)(A), any property, real or personal, "involved in" a transaction or attempted transaction in violation of 18 U.S.C. § 1956 (Money laundering) is subject to criminal and civil forfeiture. Forfeiture pursuant to these statutes applies to more than just the proceeds of the crime. These forfeitures encompass all property

3

"involved in" the crime or the attempted crime, which can include "clean" or "legitimate" money that is commingled with "tainted" money derived from illicit sources. This commingling is a laundering technique that facilitates the scheme because it obfuscates the trail of the illicit funds. *See, e.g.*, *United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005) (the presence of legitimate funds does not make a money laundering transaction lawful; it is only necessary to show that the transaction involves criminal proceeds); *United States v. Bikundi*, 125 F. Supp. 3d 178, 194 (D.D.C. 2015) (even "otherwise untainted money may become 'involved' in a money laundering offense" for these purposes "where those funds are comingled with illicit proceeds" and "the government produces evidence that the legitimate funds were used to conceal the source of illicit proceeds.")

13.    18 U.S.C. § 981(b) states that property subject to forfeiture under Section 981 may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," and may be executed "in any district in which the property is found," if there is probable cause to believe the property is subject to forfeiture. 18 U.S.C. § 982(b)(l) incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for all stages of a criminal forfeiture proceeding. Section 853 permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture. Seizures are appropriate from this district, because the criminal offenses under investigation were begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, and no offender is known to have, or have had, residence within any United States district. *See* 18 U.S.C. § 3238.

## DEFINITIONS

14.    **Virtual Currency**: Virtual currencies are digital tokens of value circulated over the Internet. Virtual currencies are typically not issued by any government or bank like traditional fiat currencies, such as the U.S. dollar, but rather are generated and controlled through computer

software. Different virtual currencies operate on different blockchains, and there are many different, widely used virtual currencies currently in circulation. Bitcoin (or BTC) and ether (ETH) are currently the most well-known virtual currencies in use. BTC exists on the Bitcoin blockchain, and ETH exists on the Ethereum network. Typically, a virtual currency that is "native" to a particular blockchain cannot be used on a different blockchain. Thus, absent technological solutions those native assets are siloed within a specific blockchain. For instance, ETH (the native token on the Ethereum network) cannot be used on other networks unless it is "wrapped" by smart contract code.

15.    **Stablecoins**: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. Stablecoins achieve their price stability via collateralizations (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

16.    **Tether (USDT)**: Tether Limited is a company that manages the smart contracts and the treasury (*i.e.,* the funds held in reserve) for USDT, a stablecoin pegged to the U.S. dollar.

17.    **USD Coin (USDC)**: Circle Internet Financial Limited ("Circle") is a company that manages the smart contracts and the treasury (*i.e.,* the funds held in reserve) for USDC, a stablecoin pegged to the U.S. dollar.

18.    **Virtual Currency Address**: Virtual currency addresses are the particular virtual locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of letters and numbers.

19.    **Private Key**: Each virtual currency address is controlled through the use of a unique corresponding private key, a cryptographic equivalent of a password, which is needed to access the address. Only the holder of an address's private key can authorize a transfer of virtual currency from that address to another address.

20.    **<u>Virtual Currency Wallet</u>**: There are various types of virtual currency wallets, including software wallets, hardware wallets, and paper wallets. The virtual currency wallets at issue for the purposes of this affidavit are software wallets (*i.e.,* a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys). A virtual currency wallet allows users to store, send, and receive virtual currencies. A virtual currency wallet can hold many virtual currency addresses at the same time.

21.    Wallets that are hosted by third parties are referred to as "hosted wallets" because the third party retains a customer's funds until the customer is ready to transact with those funds. Conversely, wallets that allow users to exercise total, independent control over their funds are often called "unhosted" wallets.

22.    **<u>Blockchain</u>**: Many virtual currencies publicly record all of their transactions on what is known as a blockchain. The blockchain is essentially a distributed public ledger, run by the decentralized network of computers, containing an immutable and historical record of every transaction utilizing that blockchain's technology. The blockchain can be updated multiple times per hour and records every virtual currency address that has ever received that virtual currency and maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies.

23.    **<u>Blockchain Explorer</u>**: These explorers are online tools that operate as a blockchain search engine allowing users the ability to search for and review transactional data for any addresses on a particular blockchain. A blockchain explorer is software that uses application programming

interface ("API")[1] and blockchain nodes to draw data from a blockchain and uses a database to arrange and present the data to a user in a searchable format.

24.    **Smart Contracts**: Smart contracts are computer programs stored on a blockchain that run when predetermined conditions are met. Typically, they are used to automate the execution of an agreement so that all participants can be immediately certain of the outcome, without any intermediary's involvement. The Ethereum network is designed and functions based on smart contracts.

25.    **Virtual Currency Bridge:** A blockchain bridge, otherwise known as a cross-chain bridge, connects two blockchains and allows users to send virtual currency from one chain to the other.

26.    **Virtual Currency Exchanges (VCEs)**: VCEs are trading and/or storage platforms for virtual currencies, such as BTC and ETH. There are generally two types of VCEs: centralized exchanges and decentralized exchanges, which are also known as "DEXs." Many VCEs also store their customers' virtual currency in virtual currency wallets. As previously stated, these wallets can hold multiple virtual currency addresses associated with a user on a VCE's network. Because VCEs act as money services businesses, they are legally required to conduct due diligence of their customers (i.e., KYC checks) and to have anti-money laundering programs in place (to the extent they operate and service customers in the United States).

27.    **Virtual Currency Mixers:** Virtual currency mixers (also known as tumblers or mixing services) are software services that allow users, for a fee, to send virtual currency to designated recipients in a manner designed to conceal and obfuscate the source of the virtual

---

[1]    API is an initialism for "application programming interface," which is a set of definitions and protocols for building and integrating application software.

currency. Virtual currency mixers are a common laundering tool used by North Korean cyber actors and their money laundering co-conspirators.

28.    **Blockchain Analysis:** As previously stated, while the identity of a virtual currency address owner is generally anonymous, law enforcement can identify the owner of a particular virtual currency address by analyzing the blockchain (*e.g.*, the Bitcoin blockchain). The analysis can also reveal additional addresses controlled by the same individual or entity. "[W]hen an organization creates multiple [BTC] addresses, it will often combine its [BTC] addresses into a separate, central [BTC] address (*i.e.*, a "cluster"). It is possible to identify a 'cluster' of [BTC] addresses held by one organization by analyzing the [BTC] blockchain's transaction history. Open-source tools and private software products can be used to analyze a transaction." *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020).

29.    In addition to using publicly available blockchain explorers, law enforcement uses commercial services offered by several different blockchain-analysis companies to investigate virtual currency transactions. These companies analyze virtual currency blockchains and attempt to identify the individuals or groups involved in transactions. Through numerous unrelated investigations, law enforcement has found the information provided by these tools to be reliable.

30.    **Decentralized Finance (DeFi):** Decentralized Finance, or DeFi, is an umbrella term for financial services on public blockchains, primarily the Ethereum network. The Ethereum network's native virtual currency is ETH. Ethereum was the first blockchain that offered various decentralized services within its network. To make these services possible, the Ethereum network allows other tokens besides ETH to run within the network. These tokens are known as ERC-20 tokens.

31.    DeFi is a term used to describe a financial system that operates without the need for traditional, centralized intermediaries. Instead, DeFi platforms offer an alternative financial system that is open for anyone to use, and that allows centralized intermediaries to be replaced by decentralized applications (or dApps). With DeFi, one can do most of the things that banks support—earn interest, borrow, lend, buy insurance, trade derivatives, trade assets, etc.—but it is faster than using traditional banks and does not require paperwork or a third party. DeFi is global, peer-to-peer (*i.e.*, directly between two people rather than routed through a centralized system), pseudonymous, and open to the public.

## **STATEMENT OF FACTS**

### **Background on North Korean Information Technology Workers**

32.    The Federal Bureau of Investigation ("FBI") is investigating several recent virtual currency heists perpetrated by known and suspected Democratic People's Republic of Korea ("DPRK" or "North Korea") information technology ("IT") workers who use false identities to gain employment—typically remote employment—as developers, among other jobs, with virtual currency companies and then subsequently exploit these companies' smart contracts to steal funds. This includes the March 15, 2024, theft of approximately $2 million dollars' worth of virtual currency from Company 1, as further described below.

33.    In May 2022, the United States Government issued a Public Service Announcement describing this type of scheme.[2] In sum, the North Korean regime has dispatched thousands of highly skilled IT workers around the world to countries other than the United States to generate revenue that contributes to its weapons of mass destruction, ballistic missile, and cyber programs. These IT

---

[2] *See* the joint Department of Treasury, Department of State, and Federal Bureau of Investigation Fact Sheet dated May 16, 2022, which is available here: https://ofac.treasury.gov/media/923131/download?inline.

workers accomplish this fraud by posing as non-North Korean nationals through identity theft and the assistance of co- conspirators located around the world, including in the United States. IT workers use these personas to gain remote employment with companies, including virtual currency platforms, and then funnel payments back to the regime. IT workers regularly use U.S.-based computer infrastructure to create persona accounts. IT workers sometimes use their privileged access to victim company networks/U.S.-based computer infrastructure for illicit purposes, such as stealing cryptocurrency and enabling or conducting malicious cyber intrusions.

34.     The FBI attributed the Company 1 theft to North Korean IT workers based on, among other things, distinctive tactics, techniques, and procedures observed in this heist and other virtual currency heists linked to North Korea IT workers. Specifically, the North Korean IT workers attained remote employment under false pretenses as a blockchain developer to gain access to the Company 1's private key, followed by laundering of the stolen funds through several exchanges, swapping currencies or value to different blockchains, to make following those assets more difficult and to prevent stolen funds from being frozen by law enforcement, as described in detail below. Also, in this case, there was an Internet Protocol (IP) address associated with the Windscribe Virtual Private Network (VPN) service that was used to access the Company 1 email accounts of all five developers. VPNs serve as an intermediary between a computer and the Internet, which enables the computer user to hide their true IP address. The same IP address was previously used by another suspected North Korean IT worker in a different FBI investigation.

**Summary of the Company 1 Heist**

35.     Company 1 is a DeFi virtual currency platform for yield farming. Yield farming is an investment strategy that involves depositing virtual currency into a DeFi platform in order to earn interest. DeFi platforms, such as Company 1, are operated by self-executing agreements written in

code, known as "smart contracts," which automate the trading process. The smart contracts algorithmically track the prices of various virtual currencies and often leverage locked reserves of virtual currency known as "liquidity pools" to facilitate trades. Company 1 allows users to deposit virtual currency into liquidity pools called vaults.  Company 1 is an Australian-based company with no physical presence in the United States.

36.    On or about March 15, 2024, North Korean actors stole the following virtual currencies from the Company 1platform: USDT and USDC.e.[3] Company 1's stolen virtual currency was laundered through multiple platforms, including virtual currency bridges and virtual currency exchanges, in order to move the value of the virtual currency from one blockchain to another. For example, the North Korean actors used the blockchain bridging services LI.FI and Allbridge Core, as well as the virtual currency exchanges Binance and MEXC. The use of bridging services and exchanges in this fashion is a money laundering technique used to obfuscate the true source of these transactions. After the virtual currency was sent through blockchain bridging services, multiple additional transactions were conducted, leading to the addresses that comprise the Defendant Property.

37.    The Defendant Property represents a majority of the funds traceable to the March 2024 exploit and theft of funds from Company 1. The following diagram presents an overview of how the stolen funds from Company 1 were laundered and eventually sent to the Defendant Property:

---

[3] USDC.e is an Ethereum-based USDC token that has been converted and sent to Arbitrum.



**Company 1 Heist and Tracing of Funds**

38.     On or about March 15, 2024, a developer employed by Company 1 and later determined to be a North Korean IT worker stole approximately $2 million dollars' worth of virtual currency from the platform. Company 1 did not know the developer was a North Korean IT worker, and Company 1 had nothing to do with the heist. While working remotely, the North Korean IT worker used the "bridgeViaLifi" function of Company 1's master smart contract.[4] According to the Company 1 CEO, one of the platform's developers—that is, a North Korean IT worker—solely held the private key needed to access and execute the master smart contract. Using this master key, the North Korean IT worker executed the smart contract code and called, without authorization, the bridgeViaLifi function, which initiated an unauthorized transfer of virtual currency assets from virtual currency wallets belonging to Company 1 to wallets controlled by the North Korean IT worker and/or the North Korean IT worker's money laundering co-conspirators. Using blockchain explorers and analytic techniques, the FBI examined the transactions associated with the unauthorized exploit of the master smart contract and confirmed approximately 1,860,257 USDT

---

[4] A "master smart contract" refers to a single, overarching smart contract that acts as a foundational agreement, setting the general terms and conditions for other, more specific smart contracts.

and 252,425 USDC.e were withdrawn from Company 1's virtual currency wallets, which was stored in three separate vaults—*i.e.*, wallets—on two separate blockchains, the Arbitrum blockchain and Avalanche blockchain.

39.    The North Korean actors laundered the stolen virtual currency through virtual currency bridges and virtual currency exchanges before moving the virtual currency to other addresses and exchanges. **Stage 1** of the laundering involved the initial theft from Company 1 through the LI.FI bridge, the MEXC exchange, and the Binance exchange in order to convert the stolen virtual currency into USDT on the Solana blockchain. **Stage 2** of the laundering involved using the Allbridge Core bridge, the MEXC exchange, and the Binance exchange in order to convert the stolen virtual currency into USDT on the Tron blockchain. **Stage 3** of the laundering involved the movement of the stolen virtual currency into other Tron addresses and exchange accounts. Each stage is described in detail, below.

### *Laundering Stage 1*

40.    The stolen USDT and USDC.e was valued at approximately $2 million as of March 15, 2024. Upon exploiting the "bridgeViaLifi" function of Company 1's smart contract, the actors moved the virtual currency through the LI.FI blockchain bridging service.  They converted the stolen USDC.e into USDT and deposited it into Arbitrum addresses 0xD6d4e8038DF50803412d1b1Ad2c9845BACf7c52b ("0xD6d4") and 0x76783b5387A3C95cc96442BF609d214547ED0cf4 ("0x76783"), as described in detail below.

41.    The stolen 252,425 USDC.e was converted into USDT on the Avalanche blockchain. Specifically, the actors exploited the "bridgeViaLifi" function of Company 1's smart contract, moved the USDC.e through the LI.FI and Stargate blockchain bridging services, converted it into

USDT on the Arbitrum blockchain, and the deposited newly converted USDT into Arbitrum address 0x76783.

42.    The North Korean actors deposited the USDT from address 0xD6d4 into the Binance and MEXC exchanges. They specifically moved the virtual currency into address 0x563aBc82E814dA99C006d75b5b3381B23fA6F496 ("0x563aB"), which was associated with an account at the Binance exchange, and address 0xcC785304F9B651962f662CE7E8731bA85D15Ac69 ("0xcC785"), which was associated with an account at the MEXC exchange.

43.    The North Korean actors deposited the USDT from address 0x76783 to 0xcC785.

44.    The North Korean actors then withdrew the virtual currency they had deposited into Binance address 0x563aB as USDT and transferred the funds to CPp4ZGwk22XwdWaRa99NdoXM68xJ8XgkPy22LymzBgaK ("CPp4ZG") on the Solana blockchain. The North Korean actors also withdrew the virtual currency deposited into 0xcC785 at the MEXC exchange as USDT and transferred it to nine addresses on the Solana blockchain. Those addresses are as follows:

    a.  CPp4ZG;

    b.  9cHPoCzekfxozVEdBqrjsnt3kuWoHMDR5fkWnGobTnqN ("9cHPoC");

    c.  Hq2bPMuGKamdafHs9EUvD6aaamn9ctM1oUKtHTi38ot1 ("Hq2bPM");

    d.  4NY1c8S5YN6jVdPTEZ7VRTWPm2kAi1QtcYuhpqXKYJia ("4NY1c8");

    e.  BAdMy9mfJ8fU9uWNS25CCPhT1fc8ELgsz94wvoMuXF6 ("BAdMy9");

    f.  9zVYZ3LViQvroY2nfDwDrynnxewMz287o3qvcr8h5D75 ("9zVYZ3");

    g.  6bZKwpSwVaSqpdpQqmKzkAz4SmKR4YiSyRafawZuSARB ("6bZKw");

    h.  Ec9PKkYKVXviDPBEKKB8FaJb9umgCWfLHEFdFRQumNBd  ("Ec9PKk");

and

    i. Cs2kjqTQZXmGU2mB4g5vGGJFbmABZpuEv93LsbcEHAe2 ("Cs2kjq").

*Laundering Stage 2*

45.    After the funds were transferred to the nine Solana addresses listed in the preceding paragraph, the North Korean actors continued to launder the funds by conducting multiple intermediary transactions, as described below.

46.    The North Korean actors next moved the virtual currency in some of the Solana blockchain addresses into the Allbridge Core bridging service, as described below, which converted the USDT within the Solana address into USDT on the Tron blockchain. The virtual currency was then moved into Tron addresses that were frozen by Tether at the request of the U.S. government, all of which constitutes a portion of the funds that is the **Defendant Property**. These transactions are described below:

    a. On or about March 16, 2024, approximately 69,753 USDT was moved from CPp4ZG through the Allbridge Core service into Tron address TWyeAYSVLHXLpicj3MrhRj5UiV9vaXQ2jy.

    b. On or about March 16, 2024, approximately 69,442 USDT was moved from CPp4ZG through the Allbridge Core service into Tron address TB5eJNs5mSw96MsN3XHRgMEAYXGTyH1s6L.

    c. On or about March 16, 2024, approximately 69,796 USDT was moved from CPp4ZG through the Allbridge Core service into Tron address TRqmz8iGdokUrC86ZwUXvUNPbeJmuS1MiA.

d.  On or about March 16, 2024, approximately 72,428 USDT was moved from CPp4ZG through the Allbridge Core service into Tron address TQUEcJPhF8pfcLoQYvdA8GXKPtnndjyVz4.

e.  On or about March 16, 2024, approximately 69,359 USDT was moved from 9cHPoC through the Allbridge Core service into Tron address TXRLECekvqrQdJP7oKdEa7jASo3Xqt2vmU.

f.  On or about March 16, 2024, approximately 66,428 USDT was moved from 9cHPoC through the Allbridge Core service into Tron address TQxi9eaWWqsizqMNHCqbbaXNYXeKVdHU3A.

g.  On or about March 16, 2024, approximately 59,275 USDT was moved from BAdMy9 through the Allbridge Core service into Tron address TR4hnXWySixVbxEFPixZyyzmCRNmnkqm87.

h.  On or about March 16, 2024, approximately 59,499 USDT was moved from BAdMy9 through the Allbridge Core service into Tron address TrzNSjou8Np9mTbPtj4SNj2GrKX8tTeejF.

i.  On or about March 16, 2024, approximately 49,795 USDT was moved from 9zVYZ3 through the Allbridge Core service into Tron address TQKUuZ2KPC9SUSafGCYTPgHc4z7tbXAddv.

j.  On or about March 16, 2024, approximately 50,009 USDT was moved from 9zVYZ3 through the Allbridge Core service into Tron address TFDveBVrmnVSNX4aG2ooJM9BW4Uetkgiuz.

k.  On or about March 16, 2024, approximately 49,975 USDT was moved from 6bZKw through the Allbridge Core service into Tron address TR1GiFyDcY2a1sTJbbaVJL8pdzxzpGNTR6.

l.  On or about March 16, 2024, approximately 49,747 USDT was moved from 6bZKw through the Allbridge Core service into Tron address TUUytty3mzyX166A38CgpmYhyjkHJeG2gH.

m.  On or about March 16, 2024, approximately 64,123 USDT was moved from Ec9PKk through the Allbridge Core service into Tron address TL9DqwCWbzGibsYZZibjTgv4EdpSUjCgjX.

n.  On or about March 16, 2024, approximately 63,382 USDT was moved from Ec9PKk through the Allbridge Core service into Tron address TN6YKhCMSnuVTLV8DKfnX9fsjAiHQzduhD.

o.  On or about March 16, 2024, approximately 69,324 USDT was moved from Ec9PKk through the Allbridge Core service into Tron address TVMFKzJeuHHSs4GZP8raC1ztDa49Gxnddk.

p.  On or about March 16, 2024, approximately 70,463 USDT was moved from Ec9PKk through the Allbridge Core service into Tron address TGL8Y73FapSdGhSgbJAvSJvzkLfhnkJBEt.

q.  On or about March 16, 2024, approximately 74,628 USDT was moved from 9cHPoC through the Allbridge Core service into Tron address TYMrDyNwYZbnvh63JppQUdvH6FuofgKt7G.[5]

---

[5] Note that this address also received Company 1 stolen funds from the MEXC exchange, as described below in paragraph 46(c).

47.    The North Korean actors then transferred approximately 70,001 USDT from CPp4Zg to Gv7885sAb2D1hKMWpxCZMqmFmWKU3E4bursTNCzZaDF4 ("Gv7885s") and approximately 100 USDT from Hq2bPM to 398HeJhyuVGqsaeUY4RCXrKuaiGxu8s1wH3QubXJtiZW ("398He"). The actors then sent the funds in both Gv7885s and 398He back to the MEXC exchange. A portion of the virtual currency deposited into these two addresses was then converted into USDT on the Tron blockchain. At the request of the U.S. government, MEXC froze the virtual currency on the MEXC exchange, and Tether froze the virtual currency stored as USDT on the Tron blockchain, some of which constitutes funds that are part of the **Defendant Property**. These transactions are described below:

a.    On or about March 16, 2024, approximately 210,100 USDT was transferred from 4NY1c8 into Solana address 398He, which was associated with the MEXC exchange.

b.    On or about March 16, 2024, approximately 70,000 USDT sent from address Gv7885s to ASTyfSima4LLAdDgoFGkgqoKowG1LZFDr9fAQrg7iaJZ ("ASTyfS") at the MEXC exchange and was withdrawn from MEXC and transferred to Tron address TAg1sw76njiuhjh4piEp9ZA143XLFX3idj. These funds are part of the **Defendant Property**.

c.    On or about March 16, 2024, approximately 70,000 USDT sent from address 398He to ASTyfS at the MEXC exchanges and was withdrawn and transferred to Tron address TYMrDyNwYZbnvh63JppQUdvH6FuofgKt7G. [6] These funds are part of the **Defendant Property**.

---

[6] Note that this address is one of the addresses to which the actors sent USDT after bridging funds through Allbridge Core, as described above in Paragraph 45(q).

48.    Between on or about March 15 and March 16, 2024, the North Korean actors withdrew virtual currency from the Solana blockchain address starting in CPp4Zg, first referenced in paragraph 43 above, and from Solana blockchain address Hq2bPM (referenced above in paragraph 43(c)), and then deposited it in Solana blockchain address J2v6ZjoaNbPGRHAMDHtDJjF3dT47SocCn64SxponE3tA ("J2v6Zj"), which is associated with an account at Binance. A portion of these funds were frozen by Binance. The remaining funds—that is, those that Binance was unable to freeze—were converted into USDT on the Tron blockchain and transferred to an address frozen by Tether at the request of the U.S. government, which constitutes funds that are part of the **Defendant Property**. The addresses containing the funds frozen by Binance and Tether are as follows:

a.  On or about March 15, 2024, approximately 55,000 USDT was transferred from Hq2bPM into Solana address J2v6Zj. On or about March 16, 2024, approximately 69,890 USDT was deposited into the same Solana address.

b.  On or about March 15, 2024, prior to enactment of the freeze request, approximately 54,997 USDT was withdrawn from Solana address J2v6Zj and transferred to Tron address TRRNwZRbssAetYFAvvZ1bBoJbfh7PHKU7F.[7] These funds are part of the **Defendant Property**.

49.    The North Korean actors next transferred virtual currency from certain other Solana blockchain addresses into the Allbridge Core blockchain bridging service, which converted the USDT within the Solana addresses into USDT on the Tron blockchain. Specifically, between March 17 and 19, 2024, approximately 477,172 USDT was moved from Cs2kjq and BAdMy9 (referenced

---

[7] Note that this address also received stolen funds from a different Tron address, as described below in paragraph 49(a).

in paragraphs 43(e) and (i) above) through the Allbridge Core service into Tron address TMNBaFNYA1DGBiDmZcEjU81kRyX8CrkoYJ ("TMNBa"). Nearly all of the USDT was withdrawn from Tron address TMNBa to other Tron addresses and exchange accounts prior to the U.S. government's freeze request to Tether, as described in Laundering Stage 3, below.

### *Laundering Stage 3*

50. The virtual currency not frozen at address TMNBa was sent from TMNBa to the following Tron addresses and frozen by Tether in a subsequent request made of the U.S. government, which constitutes funds that are part of the **Defendant Property**:

   a. On or about March 19, 2024, approximately 129,550 USDT was moved directly into Tron address TRRNwZRbssAetYFAvvZ1bBoJbfh7PHKU7F ("TRRNwZ"). [8] Approximately 92,579 USDT was transferred from TRRNwZ to other addresses prior to the freeze request, leaving approximately 222,129 USDT within the wallet.

   b. On or about March 19, 2024, approximately 161,516 USDT was moved into Tron address TV9VvDJtqKYK9strwr8L2hf9xTzvssNLBA ("TV9VvD"). Approximately 79,256 USDT was transferred from TV9VvD to other addresses prior to the freeze request, leaving approximately 82,260 USDT within the wallet.

51. The North Korean actors also moved virtual currency from TRRNwZ to a deposit address at the OKX exchange. A portion of the virtual currency at this OKX deposit address was frozen by OKX at the request of the U.S. government, which is listed herein:

---

[8] Note that this address also received stolen funds from a Solana blockchain address, as described in paragraph 47(b), above.

    a.  On or about March 18, 2024, approximately 182,582 USDT was moved from the TRRNwZ address to Tron address TRGCZn18Y5FJ3Mi8F8LS3G7PSWoQui2h9f ("TRGCZ"), which was associated with the OKX exchange.

52.    Approximately 90,501 USDT was withdrawn from the OKX address TRGCZ and transferred to other Tron addresses located at Binance prior to the U.S. government's freeze request. The virtual currency stored on these Tron addresses at Binance were proactively frozen by Binance and each of which is listed herein:

    a.  On or about March 18, 2024, approximately 11,512 USDT was withdrawn from TRGCZ the OKX exchange and deposited into Tron address TBpMpQ9cF6iYWk5vrFm8pn8wGAjKoCuJJ2, which was associated with the Binance exchange.

    b.  On or about March 18, 2024, approximately 9,675 USDT was withdrawn from TRGCZ the OKX exchange and deposited into Tron address TQnHK9iYA3xaLtVZgMBY96baBRsgAdpqGk, which was associated with the Binance exchange.

    c.  On or about March 18, 2024, approximately 69,314 USDT was withdrawn from TRGCZ the OKX exchange and deposited into Tron address TQo9feFwtMKR8Tz2xwsD1GmkJrD8ft9CP1, which was associated with the Binance exchange.

### Seizure of Stolen Funds (including the Defendant Property)

38.    On or about April 1, 2024, the FBI seized:

    a.  69,889.537636 USDT (Solana) from Binance;

    b.  142,463.870089 USDT (Tron) from Binance;

    c.  2,794.85 USDT (Tron) from OKX; and

    d.  **1,467,761.163191 USDT** (Tron) (the **Defendant Property**) from Tether.

39.    All of the above funds were transferred into an FBI-controlled virtual currency wallet.

40.    The Defendant Property remains in the possession of the FBI; this Verified Complaint for Forfeiture *In Rem* pertains only to the **1,467,761.163191 USDT** seized from Tether, as described above.

## COUNT ONE – FORFEITURE OF DEFENDANT PROPERTY

### (18 U.S.C. §§ 981(a)(1)(C) & 28 U.S.C. § 2461(c))

41.    Paragraphs 1 through 41 are realleged and incorporated herein by reference.

42.    The Defendant Property is property constituting or derived from proceeds traceable to identity theft, computer fraud, wire fraud, and conspiracy to commit computer fraud and wire fraud, in violation of 18 U.S.C. §§ 1028, 1030, 1343, 1349 and 371.

43.    Accordingly, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c).

## COUNT TWO – FORFEITURE OF DEFENDANT PROPERTY

### (18 U.S.C. § 981(a)(1)(A))

44.    Paragraphs 1 through 40 are realleged and incorporated herein by reference.

45.    The Defendant Property are property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and 1956(h), that is, a conspiracy to conduct or attempt to conduct financial transactions involving the proceeds of specified unlawful activity, to wit, computer fraud, wire fraud, conspiracy to commit computer fraud, and conspiracy to commit wire fraud, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity,

and knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

46.    Accordingly, the Defendant Property are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C).

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that this Honorable Court issue a warrant of arrest *in rem* according to law; that judgment be entered declaring that the Defendant Property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper.

January 6, 2025
Washington, D.C.

Respectfully submitted,

MATTHEW G. OLSEN

Assistant Attorney General
National Security Division
U.S. Department of Justice

SEAN M. NEWELL
Chief, National Security Cyber Section
National Security Division
U.S. Department of Justice

By:    */s/ Gregory Jon Nicosia, Jr.*
GREGORY JON NICOSIA, JR.
D.C. Bar No. 1033923
Trial Attorney
National Security Cyber Section
National Security Division
U.S. Department of Justice
D.C. Bar No. 1033923

23

950 Pennsylvania Avenue NW
Washington, D.C.  20530
Telephone: 202-353-4273

*/s/ Rick Blaylock, Jr.*
RICK BLAYLOCK, JR.
TX Bar No. 24103294
Assistant United States Attorney
Asset Forfeiture Coordinator
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-6765

## VERIFICATION

I, Kyle M. McKnight, a Task Force Officer with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *in rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 6 day of January 2025.

Kyle M. McKnight
Task Force Officer
Federal Bureau of Investigation