**Bleicken, Peter (USADC) [Contractor]**

| | |
|---|---|
| **From:** | Dinh, Tho (USADC) [Contractor] |
| **Sent:** | Wednesday, January 15, 2025 11:23 AM |
| **To:** | bigtransition@outlook.com |
| **Cc:** | Blaylock Jr, Rick (USADC); Nicosia, Gregory (NSD); Saunders, Thomas (USADC) |
| **Subject:** | Notice of Civil Forfeiture Action 25-cv-34 |
| **Attachments:** | CFR 28.pdf; Filed Complaint 25cv34.pdf; Notice and Cover Letter - big transition.pdf; Petition for Remission.pdf |

Good Morning,

Attached is a Notice of Criminal Forfeiture Action regarding *U.S. v. Approximately 1,467,761.163191 USDT*, 1:25-cv-34. Also attached is the filed complaint, Part 9 of Title 28 of the Code of Federal Regulations, and a blank Petition for Remission.

Thank you!

Tho Dinh
Paralegal, FSA Contractor
U.S. Attorney's Office, Criminal Division
Asset Forfeiture and Money Laundering Unit
601 D Street, N.W.
Washington, D.C.  20001
202-252-7612



U.S. Department of Justice

Matthew M. Graves
United States Attorney

*District of Columbia*

*Judiciary Center*
*601 D St. N.W.*
*Washington, D.C. 20530*

January 15, 2025

**VIA ELECTRONIC MAIL**
"big transition"
bigtransition@outlook.com

     **Re:**    NOTICE OF CIVIL FORFEITURE ACTION, 25-CV-34

Dear Sir/Madam:

    The United States Attorney's Office for the District of Columbia filed a Verified Complaint for Forfeiture *In Rem* on January 06, 2025, against the property identified as:

**APPROXIMATELY 1,467,761.163191 USDT**

    Enclosed you will find the Notice of Civil Forfeiture Action, Verified Complaint, Part 9 of Title 28 of the Code of Federal Regulations, and a blank Petition for Remission.

        Sincerely,

        MATTHEW M. GRAVES
        UNITED STATES ATTORNEY

        */s/ Rick Blaylock, Jr.*
        Rick Blaylock, Jr.
        Assistant United States Attorney
        Asset Forfeiture Coordinator
        United States Attorney's Office
        601 D Street, N.W.
        Washington, D.C. 20001
        (202) 252-6765

Enclosures

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| **U.S. Attorney's Office** ) | |
| **601 D Street, NW** ) | |
| **Washington, DC 20001,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil A. No. 25-cv-34** |
| **v.** ) | |
| ) | |
| **APPROXIMATELY** ) | |
| **1,467,761.163191 USDT,** ) | |
| ) | |
| **Defendant.** ) | |

**<u>NOTICE OF JUDICIAL FORFEITURE ACTION</u>**

On January 06, 2025, the United States Attorney for the District of Columbia filed a Verified Complaint for Forfeiture in the United States District Court for the District of Columbia against:

**APPROXIMATELY 1,467,761.163191 USDT**

Pursuant to 18 U.S.C. § 983 and Rule G(4)(b) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, direct notice of this action along with a copy of the verified complaint, is being sent by FedEx mail.

Any party who intends to assert an interest in any defendant property and contest the forfeiture in court must file a verified Claim in the United States District Court, District of Columbia, <u>333 Constitution Avenue, NW, Washington, D.C. 20001</u> under case title listed above**, 24-cv-3375, within 35 days** of the Government sending this Notice, in accordance with Supplemental Rule G(5).  A corporate entity must be represented by a lawyer in order to file a

1

proper verified Claim. Additionally, claimants must serve and file Answers to the Complaint, or motions under Rule 12 of the Federal Rules of Civil Procedure, **within 21** days after filing their verified Claims.

Claims must comply with Supplemental Rule G(5)(a) and Claims and Answers are to be filed with the Clerk, United States District Court for the District of Columbia at the above address, with a copy thereof served on the undersigned Assistant United States Attorney at the address listed below.

Alternatively, any party who intends to seek the return of property may file a petition for remission or mitigation. A petition for remission or mitigation is considered by the Department of Justice, and not the Court. The petition process is further detailed in the attached Code of Federal Regulations. A petition for remission or mitigation must be submitted within **30 days** of the date notice is received. A sample petition is enclosed in this notice packet.

The filing of a petition does not serve as a substitute for filing a claim; nor does the filing of a claim serve as a substitute for filing a petition.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


*/s/ Rick Blaylock, Jr.*
Rick Blaylock, Jr.
TX Bar No. 24103294
Assistant United States Attorney
Asset Forfeiture Coordinator
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-6765

January 15, 2025

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) | |
| ) | |
| Plaintiff,      ) | |
| ) | |
| v.      ) | |
| ) | Civil Action No. 25-cv-34 |
| APPROXIMATELY 1,467,761.163191 USDT,      ) | |
| ) | |
| Defendant.      ) | |
| ) | |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, the United States of America, by and through the Assistant Attorney General for the National Security Division, brings this verified complaint for forfeiture in a civil action *in rem* against approximately 1,467,761.163191 USDT, hereinafter the "Defendant Property," and alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345, because it has been commenced by the United States, and by virtue of 28 U.S.C. § 1355(a), because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

2.      Venue is proper here under 18 U.S.C. § 3238 and 28 U.S.C. § 1395(a).

## STATUTORY AUTHORITY

### Offense Statutes

3.      This investigation relates to violations of 18 U.S.C. § 1028 (Identity theft), 18 U.S.C. § 1030 (Computer fraud and abuse), 18 U.S.C. § 1343 (Wire fraud), 18 U.S.C. § 1956 (Money laundering), and conspiracy to commit the foregoing offenses in violation of 18 U.S.C. §§ 371, 1349, and 1956(h).

4.     **Identity theft:** 18 U.S.C. § 1028(a)(1) makes it a crime, *inter alia*, to knowingly and without lawful authority produce an identification document, authentication feature, or a false identification document. 18 U.S.C. § 1028(a)(7) makes it a crime, *inter alia*, to knowingly transfer, possess, or use, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law. The term "means of identification" is defined in 18 U.S.C. § 1028(d)(7) and includes, *inter alia*, name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number.

5.     **Computer fraud and abuse:** 18 U.S.C. § 1030(a)(2)(C) makes it a crime, *inter alia*, to intentionally access a computer without authorization and thereby obtain information from any protected computer. 18 U.S.C. § 1030(a)(4) makes it a crime, *inter alia*, to knowingly and with intent to defraud, access a protected computer without authorization, and by means of such conduct further the intended fraud and obtain anything of value. The term "protected computer" is defined in 18 U.S.C. § 1030(e)(2) and includes, *inter alia*, a computer used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States. *See Van Buren v. United States*, 141 S. Ct. 1648, 1652 (2021) (definition of protected computer under 18 U.S.C. § 1030(e)(2)(B) includes "at a minimum . . . all computers that connect to the Internet").

6.     18 U.S.C. § 371 prohibits a conspiracy to commit an offense or to defraud the United States, including violations of 18 U.S.C. § 1028(a)(7) and 1030(a)(2).

7.     **Wire fraud:** 18 U.S.C. § 1343 makes it a crime for anyone, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means

of false or fraudulent pretenses, representations, or promises, to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice. 18 U.S.C. § 1349 prohibits the attempt or conspiracy of a violation of 18 U.S.C. § 1343.

8. **Money laundering:** 18 U.S.C. § 1956(a)(1)(B)(i) makes it a crime to conduct or attempt to conduct a financial transaction, knowing that the property involved in the transaction represents the proceeds of some form of unlawful activity, and which in fact involves the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. This offense is sometimes referred to as concealment money laundering.

9. The term "specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1), and it includes violations of 18 U.S.C. § 1030 (Computer fraud and abuse) and 18 U.S.C. § 1343 (Wire fraud).

10. 18 U.S.C. § 1956(h) criminalizes a conspiracy to violate § 1956.

## Forfeiture Statutes

11. Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from "proceeds" traceable to a violation of 18 U.S.C. § 1030 (Computer fraud and abuse), 18 U.S.C. § 1343 (Wire fraud), or a conspiracy to commit such offenses, is subject to criminal and civil forfeiture.

12. Pursuant to 18 U.S.C. § 982(a)(1) and 18 U.S.C. § 981(a)(1)(A), any property, real or personal, "involved in" a transaction or attempted transaction in violation of 18 U.S.C. § 1956 (Money laundering) is subject to criminal and civil forfeiture. Forfeiture pursuant to these statutes applies to more than just the proceeds of the crime. These forfeitures encompass all property

"involved in" the crime or the attempted crime, which can include "clean" or "legitimate" money that is commingled with "tainted" money derived from illicit sources. This commingling is a laundering technique that facilitates the scheme because it obfuscates the trail of the illicit funds. *See, e.g.*, *United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005) (the presence of legitimate funds does not make a money laundering transaction lawful; it is only necessary to show that the transaction involves criminal proceeds); *United States v. Bikundi*, 125 F. Supp. 3d 178, 194 (D.D.C. 2015) (even "otherwise untainted money may become 'involved' in a money laundering offense" for these purposes "where those funds are comingled with illicit proceeds" and "the government produces evidence that the legitimate funds were used to conceal the source of illicit proceeds.")

13.     18 U.S.C. § 981(b) states that property subject to forfeiture under Section 981 may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," and may be executed "in any district in which the property is found," if there is probable cause to believe the property is subject to forfeiture. 18 U.S.C. § 982(b)(l) incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for all stages of a criminal forfeiture proceeding. Section 853 permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture. Seizures are appropriate from this district, because the criminal offenses under investigation were begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, and no offender is known to have, or have had, residence within any United States district. *See* 18 U.S.C. § 3238.

## DEFINITIONS

14.     **Virtual Currency**: Virtual currencies are digital tokens of value circulated over the Internet. Virtual currencies are typically not issued by any government or bank like traditional fiat currencies, such as the U.S. dollar, but rather are generated and controlled through computer

4

software. Different virtual currencies operate on different blockchains, and there are many different, widely used virtual currencies currently in circulation. Bitcoin (or BTC) and ether (ETH) are currently the most well-known virtual currencies in use. BTC exists on the Bitcoin blockchain, and ETH exists on the Ethereum network. Typically, a virtual currency that is "native" to a particular blockchain cannot be used on a different blockchain. Thus, absent technological solutions those native assets are siloed within a specific blockchain. For instance, ETH (the native token on the Ethereum network) cannot be used on other networks unless it is "wrapped" by smart contract code.

15.      **Stablecoins**: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. Stablecoins achieve their price stability via collateralizations (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

16.      **Tether (USDT)**: Tether Limited is a company that manages the smart contracts and the treasury (*i.e.,* the funds held in reserve) for USDT, a stablecoin pegged to the U.S. dollar.

17.      **USD Coin (USDC)**: Circle Internet Financial Limited ("Circle") is a company that manages the smart contracts and the treasury (*i.e.,* the funds held in reserve) for USDC, a stablecoin pegged to the U.S. dollar.

18.      **Virtual Currency Address**: Virtual currency addresses are the particular virtual locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of letters and numbers.

19.      **Private Key**: Each virtual currency address is controlled through the use of a unique corresponding private key, a cryptographic equivalent of a password, which is needed to access the address. Only the holder of an address's private key can authorize a transfer of virtual currency from that address to another address.

20. **Virtual Currency Wallet**: There are various types of virtual currency wallets, including software wallets, hardware wallets, and paper wallets. The virtual currency wallets at issue for the purposes of this affidavit are software wallets (*i.e.,* a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys). A virtual currency wallet allows users to store, send, and receive virtual currencies. A virtual currency wallet can hold many virtual currency addresses at the same time.

21. Wallets that are hosted by third parties are referred to as "hosted wallets" because the third party retains a customer's funds until the customer is ready to transact with those funds. Conversely, wallets that allow users to exercise total, independent control over their funds are often called "unhosted" wallets.

22. **Blockchain**: Many virtual currencies publicly record all of their transactions on what is known as a blockchain. The blockchain is essentially a distributed public ledger, run by the decentralized network of computers, containing an immutable and historical record of every transaction utilizing that blockchain's technology. The blockchain can be updated multiple times per hour and records every virtual currency address that has ever received that virtual currency and maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies.

23. **Blockchain Explorer**: These explorers are online tools that operate as a blockchain search engine allowing users the ability to search for and review transactional data for any addresses on a particular blockchain. A blockchain explorer is software that uses application programming

6

interface ("API")[1] and blockchain nodes to draw data from a blockchain and uses a database to arrange and present the data to a user in a searchable format.

24.     **Smart Contracts**: Smart contracts are computer programs stored on a blockchain that run when predetermined conditions are met. Typically, they are used to automate the execution of an agreement so that all participants can be immediately certain of the outcome, without any intermediary's involvement. The Ethereum network is designed and functions based on smart contracts.

25.     **Virtual Currency Bridge:** A blockchain bridge, otherwise known as a cross-chain bridge, connects two blockchains and allows users to send virtual currency from one chain to the other.

26.     **Virtual Currency Exchanges (VCEs)**: VCEs are trading and/or storage platforms for virtual currencies, such as BTC and ETH. There are generally two types of VCEs: centralized exchanges and decentralized exchanges, which are also known as "DEXs." Many VCEs also store their customers' virtual currency in virtual currency wallets. As previously stated, these wallets can hold multiple virtual currency addresses associated with a user on a VCE's network. Because VCEs act as money services businesses, they are legally required to conduct due diligence of their customers (i.e., KYC checks) and to have anti-money laundering programs in place (to the extent they operate and service customers in the United States).

27.     **Virtual Currency Mixers:** Virtual currency mixers (also known as tumblers or mixing services) are software services that allow users, for a fee, to send virtual currency to designated recipients in a manner designed to conceal and obfuscate the source of the virtual

---

[1]     API is an initialism for "application programming interface," which is a set of definitions and protocols for building and integrating application software.

currency. Virtual currency mixers are a common laundering tool used by North Korean cyber actors and their money laundering co-conspirators.

28. **Blockchain Analysis:** As previously stated, while the identity of a virtual currency address owner is generally anonymous, law enforcement can identify the owner of a particular virtual currency address by analyzing the blockchain (*e.g.*, the Bitcoin blockchain). The analysis can also reveal additional addresses controlled by the same individual or entity. "[W]hen an organization creates multiple [BTC] addresses, it will often combine its [BTC] addresses into a separate, central [BTC] address (*i.e.*, a "cluster"). It is possible to identify a 'cluster' of [BTC] addresses held by one organization by analyzing the [BTC] blockchain's transaction history. Open-source tools and private software products can be used to analyze a transaction." *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020).

29. In addition to using publicly available blockchain explorers, law enforcement uses commercial services offered by several different blockchain-analysis companies to investigate virtual currency transactions. These companies analyze virtual currency blockchains and attempt to identify the individuals or groups involved in transactions. Through numerous unrelated investigations, law enforcement has found the information provided by these tools to be reliable.

30. **Decentralized Finance (DeFi):** Decentralized Finance, or DeFi, is an umbrella term for financial services on public blockchains, primarily the Ethereum network. The Ethereum network's native virtual currency is ETH. Ethereum was the first blockchain that offered various decentralized services within its network. To make these services possible, the Ethereum network allows other tokens besides ETH to run within the network. These tokens are known as ERC-20 tokens.

31.     DeFi is a term used to describe a financial system that operates without the need for traditional, centralized intermediaries. Instead, DeFi platforms offer an alternative financial system that is open for anyone to use, and that allows centralized intermediaries to be replaced by decentralized applications (or dApps). With DeFi, one can do most of the things that banks support—earn interest, borrow, lend, buy insurance, trade derivatives, trade assets, etc.—but it is faster than using traditional banks and does not require paperwork or a third party. DeFi is global, peer-to-peer (*i.e.*, directly between two people rather than routed through a centralized system), pseudonymous, and open to the public.

## STATEMENT OF FACTS

### Background on North Korean Information Technology Workers

32.     The Federal Bureau of Investigation ("FBI") is investigating several recent virtual currency heists perpetrated by known and suspected Democratic People's Republic of Korea ("DPRK" or "North Korea") information technology ("IT") workers who use false identities to gain employment—typically remote employment—as developers, among other jobs, with virtual currency companies and then subsequently exploit these companies' smart contracts to steal funds. This includes the March 15, 2024, theft of approximately $2 million dollars' worth of virtual currency from Company 1, as further described below.

33.     In May 2022, the United States Government issued a Public Service Announcement describing this type of scheme.[2] In sum, the North Korean regime has dispatched thousands of highly skilled IT workers around the world to countries other than the United States to generate revenue that contributes to its weapons of mass destruction, ballistic missile, and cyber programs. These IT

---

[2] *See* the joint Department of Treasury, Department of State, and Federal Bureau of Investigation Fact Sheet dated May 16, 2022, which is available here: https://ofac.treasury.gov/media/923131/download?inline.

workers accomplish this fraud by posing as non-North Korean nationals through identity theft and the assistance of co- conspirators located around the world, including in the United States. IT workers use these personas to gain remote employment with companies, including virtual currency platforms, and then funnel payments back to the regime. IT workers regularly use U.S.-based computer infrastructure to create persona accounts. IT workers sometimes use their privileged access to victim company networks/U.S.-based computer infrastructure for illicit purposes, such as stealing cryptocurrency and enabling or conducting malicious cyber intrusions.

34.     The FBI attributed the Company 1 theft to North Korean IT workers based on, among other things, distinctive tactics, techniques, and procedures observed in this heist and other virtual currency heists linked to North Korea IT workers. Specifically, the North Korean IT workers attained remote employment under false pretenses as a blockchain developer to gain access to the Company 1's private key, followed by laundering of the stolen funds through several exchanges, swapping currencies or value to different blockchains, to make following those assets more difficult and to prevent stolen funds from being frozen by law enforcement, as described in detail below. Also, in this case, there was an Internet Protocol (IP) address associated with the Windscribe Virtual Private Network (VPN) service that was used to access the Company 1 email accounts of all five developers. VPNs serve as an intermediary between a computer and the Internet, which enables the computer user to hide their true IP address. The same IP address was previously used by another suspected North Korean IT worker in a different FBI investigation.

### Summary of the Company 1 Heist

35.     Company 1 is a DeFi virtual currency platform for yield farming. Yield farming is an investment strategy that involves depositing virtual currency into a DeFi platform in order to earn interest. DeFi platforms, such as Company 1, are operated by self-executing agreements written in

code, known as "smart contracts," which automate the trading process. The smart contracts algorithmically track the prices of various virtual currencies and often leverage locked reserves of virtual currency known as "liquidity pools" to facilitate trades. Company 1 allows users to deposit virtual currency into liquidity pools called vaults.  Company 1 is an Australian-based company with no physical presence in the United States.

36.     On or about March 15, 2024, North Korean actors stole the following virtual currencies from the Company 1 platform: USDT and USDC.e.[3] Company 1's stolen virtual currency was laundered through multiple platforms, including virtual currency bridges and virtual currency exchanges, in order to move the value of the virtual currency from one blockchain to another. For example, the North Korean actors used the blockchain bridging services LI.FI and Allbridge Core, as well as the virtual currency exchanges Binance and MEXC. The use of bridging services and exchanges in this fashion is a money laundering technique used to obfuscate the true source of these transactions. After the virtual currency was sent through blockchain bridging services, multiple additional transactions were conducted, leading to the addresses that comprise the Defendant Property.

37.     The Defendant Property represents a majority of the funds traceable to the March 2024 exploit and theft of funds from Company 1. The following diagram presents an overview of how the stolen funds from Company 1 were laundered and eventually sent to the Defendant Property:

---

[3] USDC.e is an Ethereum-based USDC token that has been converted and sent to Arbitrum.



**Company 1 Heist and Tracing of Funds**

38.     On or about March 15, 2024, a developer employed by Company 1 and later determined to be a North Korean IT worker stole approximately $2 million dollars' worth of virtual currency from the platform. Company 1 did not know the developer was a North Korean IT worker, and Company 1 had nothing to do with the heist. While working remotely, the North Korean IT worker used the "bridgeViaLifi" function of Company 1's master smart contract.[4] According to the Company 1 CEO, one of the platform's developers—that is, a North Korean IT worker—solely held the private key needed to access and execute the master smart contract. Using this master key, the North Korean IT worker executed the smart contract code and called, without authorization, the bridgeViaLifi function, which initiated an unauthorized transfer of virtual currency assets from virtual currency wallets belonging to Company 1 to wallets controlled by the North Korean IT worker and/or the North Korean IT worker's money laundering co-conspirators. Using blockchain explorers and analytic techniques, the FBI examined the transactions associated with the unauthorized exploit of the master smart contract and confirmed approximately 1,860,257 USDT

---

[4] A "master smart contract" refers to a single, overarching smart contract that acts as a foundational agreement, setting the general terms and conditions for other, more specific smart contracts.

and 252,425 USDC.e were withdrawn from Company 1's virtual currency wallets, which was stored in three separate vaults—*i.e.*, wallets—on two separate blockchains, the Arbitrum blockchain and Avalanche blockchain.

39.     The North Korean actors laundered the stolen virtual currency through virtual currency bridges and virtual currency exchanges before moving the virtual currency to other addresses and exchanges. **Stage 1** of the laundering involved the initial theft from Company 1 through the LI.FI bridge, the MEXC exchange, and the Binance exchange in order to convert the stolen virtual currency into USDT on the Solana blockchain. **Stage 2** of the laundering involved using the Allbridge Core bridge, the MEXC exchange, and the Binance exchange in order to convert the stolen virtual currency into USDT on the Tron blockchain. **Stage 3** of the laundering involved the movement of the stolen virtual currency into other Tron addresses and exchange accounts. Each stage is described in detail, below.

### *Laundering Stage 1*

40.     The stolen USDT and USDC.e was valued at approximately $2 million as of March 15, 2024. Upon exploiting the "bridgeViaLifi" function of Company 1's smart contract, the actors moved the virtual currency through the LI.FI blockchain bridging service.  They converted the stolen USDC.e into USDT and deposited it into Arbitrum addresses 0xD6d4e8038DF50803412d1b1Ad2c9845BACf7c52b ("0xD6d4") and 0x76783b5387A3C95cc96442BF609d214547ED0cf4 ("0x76783"), as described in detail below.

41.     The stolen 252,425 USDC.e was converted into USDT on the Avalanche blockchain. Specifically, the actors exploited the "bridgeViaLifi" function of Company 1's smart contract, moved the USDC.e through the LI.FI and Stargate blockchain bridging services, converted it into

USDT on the Arbitrum blockchain, and the deposited newly converted USDT into Arbitrum address 0x76783.

42.     The North Korean actors deposited the USDT from address 0xD6d4 into the Binance and MEXC exchanges. They specifically moved the virtual currency into address 0x563aBc82E814dA99C006d75b5b3381B23fA6F496 ("0x563aB"), which was associated with an account at the Binance exchange, and address 0xcC785304F9B651962f662CE7E8731bA85D15Ac69 ("0xcC785"), which was associated with an account at the MEXC exchange.

43.     The North Korean actors deposited the USDT from address 0x76783 to 0xcC785.

44.     The North Korean actors then withdrew the virtual currency they had deposited into Binance address 0x563aB as USDT and transferred the funds to CPp4ZGwk22XwdWaRa99NdoXM68xJ8XgkPy22LymzBgaK ("CPp4ZG") on the Solana blockchain. The North Korean actors also withdrew the virtual currency deposited into 0xcC785 at the MEXC exchange as USDT and transferred it to nine addresses on the Solana blockchain. Those addresses are as follows:

   a.  CPp4ZG;

   b.  9cHPoCzekfxozVEdBqrjsnt3kuWoHMDR5fkWnGobTnqN ("9cHPoC");

   c.  Hq2bPMuGKamdafHs9EUvD6aaamn9ctM1oUKtHTi38ot1 ("Hq2bPM");

   d.  4NY1c8S5YN6jVdPTEZ7VRTWPm2kAi1QtcYuhpqXKYJia ("4NY1c8");

   e.  BAdMy9mfJ8fU9uWNS25CCPhT1fc8ELgsz94wvoMuXF6 ("BAdMy9");

   f.  9zVYZ3LViQvroY2nfDwDrynnxewMz287o3qvcr8h5D75 ("9zVYZ3");

   g.  6bZKwpSwVaSqpdpQqmKzkAz4SmKR4YiSyRafawZuSARB ("6bZKw");

   h.  Ec9PKkYKVXviDPBEKKB8FaJb9umgCWfLHEFdFRQumNBd  ("Ec9PKk");

and

i. Cs2kjqTQZXmGU2mB4g5vGGJFbmABZpuEv93LsbcEHAe2 ("Cs2kjq").

*Laundering Stage 2*

45.      After the funds were transferred to the nine Solana addresses listed in the preceding paragraph, the North Korean actors continued to launder the funds by conducting multiple intermediary transactions, as described below.

46.      The North Korean actors next moved the virtual currency in some of the Solana blockchain addresses into the Allbridge Core bridging service, as described below, which converted the USDT within the Solana address into USDT on the Tron blockchain. The virtual currency was then moved into Tron addresses that were frozen by Tether at the request of the U.S. government, all of which constitutes a portion of the funds that is the **Defendant Property**. These transactions are described below:

    a. On or about March 16, 2024, approximately 69,753 USDT was moved from CPp4ZG through the Allbridge Core service into Tron address TWyeAYSVLHXLpicj3MrhRj5UiV9vaXQ2jy.

    b. On or about March 16, 2024, approximately 69,442 USDT was moved from CPp4ZG through the Allbridge Core service into Tron address TB5eJNs5mSw96MsN3XHRgMEAYXGTyH1s6L.

    c. On or about March 16, 2024, approximately 69,796 USDT was moved from CPp4ZG through the Allbridge Core service into Tron address TRqmz8iGdokUrC86ZwUXvUNPbeJmuS1MiA.

d. On or about March 16, 2024, approximately 72,428 USDT was moved from CPp4ZG through the Allbridge Core service into Tron address TQUEcJPhF8pfcLoQYvdA8GXKPtnndjyVz4.

e. On or about March 16, 2024, approximately 69,359 USDT was moved from 9cHPoC through the Allbridge Core service into Tron address TXRLECekvqrQdJP7oKdEa7jASo3Xqt2vmU.

f. On or about March 16, 2024, approximately 66,428 USDT was moved from 9cHPoC through the Allbridge Core service into Tron address TQxi9eaWWqsizqMNHCqbbaXNYXeKVdHU3A.

g. On or about March 16, 2024, approximately 59,275 USDT was moved from BAdMy9 through the Allbridge Core service into Tron address TR4hnXWySixVbxEFPixZyyzmCRNmnkqm87.

h. On or about March 16, 2024, approximately 59,499 USDT was moved from BAdMy9 through the Allbridge Core service into Tron address TrzNSjou8Np9mTbPtj4SNj2GrKX8tTeejF.

i. On or about March 16, 2024, approximately 49,795 USDT was moved from 9zVYZ3 through the Allbridge Core service into Tron address TQKUuZ2KPC9SUSafGCYTPgHc4z7tbXAddv.

j. On or about March 16, 2024, approximately 50,009 USDT was moved from 9zVYZ3 through the Allbridge Core service into Tron address TFDveBVrmnVSNX4aG2ooJM9BW4Uetkgiuz.

k.  On or about March 16, 2024, approximately 49,975 USDT was moved from 6bZKw through the Allbridge Core service into Tron address TR1GiFyDcY2a1sTJbbaVJL8pdzxzpGNTR6.

l.  On or about March 16, 2024, approximately 49,747 USDT was moved from 6bZKw through the Allbridge Core service into Tron address TUUytty3mzyX166A38CgpmYhyjkHJeG2gH.

m.  On or about March 16, 2024, approximately 64,123 USDT was moved from Ec9PKk through the Allbridge Core service into Tron address TL9DqwCWbzGibsYZZibjTgv4EdpSUjCgjX.

n.  On or about March 16, 2024, approximately 63,382 USDT was moved from Ec9PKk through the Allbridge Core service into Tron address TN6YKhCMSnuVTLV8DKfnX9fsjAiHQzduhD.

o.  On or about March 16, 2024, approximately 69,324 USDT was moved from Ec9PKk through the Allbridge Core service into Tron address TVMFKzJeuHHSs4GZP8raC1ztDa49Gxnddk.

p.  On or about March 16, 2024, approximately 70,463 USDT was moved from Ec9PKk through the Allbridge Core service into Tron address TGL8Y73FapSdGhSgbJAvSJvzkLfhnkJBEt.

q.  On or about March 16, 2024, approximately 74,628 USDT was moved from 9cHPoC through the Allbridge Core service into Tron address TYMrDyNwYZbnvh63JppQUdvH6FuofgKt7G.[5]

---

[5] Note that this address also received Company 1 stolen funds from the MEXC exchange, as described below in paragraph 46(c).

47.    The North Korean actors then transferred approximately 70,001 USDT from CPp4Zg to Gv7885sAb2D1hKMWpxCZMqmFmWKU3E4bursTNCzZaDF4 ("Gv7885s") and approximately 100 USDT from Hq2bPM to 398HeJhyuVGqsaeUY4RCXrKuaiGxu8s1wH3QubXJtiZW ("398He"). The actors then sent the funds in both Gv7885s and 398He back to the MEXC exchange. A portion of the virtual currency deposited into these two addresses was then converted into USDT on the Tron blockchain. At the request of the U.S. government, MEXC froze the virtual currency on the MEXC exchange, and Tether froze the virtual currency stored as USDT on the Tron blockchain, some of which constitutes funds that are part of the **Defendant Property**. These transactions are described below:

    a.  On or about March 16, 2024, approximately 210,100 USDT was transferred from 4NY1c8 into Solana address 398He, which was associated with the MEXC exchange.

    b.  On or about March 16, 2024, approximately 70,000 USDT sent from address Gv7885s to ASTyfSima4LLAdDgoFGkgqoKowG1LZFDr9fAQrg7iaJZ ("ASTyfS") at the MEXC exchange and was withdrawn from MEXC and transferred to Tron address TAg1sw76njiuhjh4piEp9ZA143XLFX3idj. These funds are part of the **Defendant Property**.

    c.  On or about March 16, 2024, approximately 70,000 USDT sent from address 398He to ASTyfS at the MEXC exchanges and was withdrawn and transferred to Tron address TYMrDyNwYZbnvh63JppQUdvH6FuofgKt7G. [6] These funds are part of the **Defendant Property**.

---

[6] Note that this address is one of the addresses to which the actors sent USDT after bridging funds through Allbridge Core, as described above in Paragraph 45(q).

48.    Between on or about March 15 and March 16, 2024, the North Korean actors withdrew virtual currency from the Solana blockchain address starting in CPp4Zg, first referenced in paragraph 43 above, and from Solana blockchain address Hq2bPM (referenced above in paragraph 43(c)), and then deposited it in Solana blockchain address J2v6ZjoaNbPGRHAMDHtDJjF3dT47SocCn64SxponE3tA ("J2v6Zj"), which is associated with an account at Binance. A portion of these funds were frozen by Binance. The remaining funds—that is, those that Binance was unable to freeze—were converted into USDT on the Tron blockchain and transferred to an address frozen by Tether at the request of the U.S. government, which constitutes funds that are part of the **Defendant Property**. The addresses containing the funds frozen by Binance and Tether are as follows:

    a.    On or about March 15, 2024, approximately 55,000 USDT was transferred from Hq2bPM into Solana address J2v6Zj. On or about March 16, 2024, approximately 69,890 USDT was deposited into the same Solana address.

    b.    On or about March 15, 2024, prior to enactment of the freeze request, approximately 54,997 USDT was withdrawn from Solana address J2v6Zj and transferred to Tron address TRRNwZRbssAetYFAvvZ1bBoJbfh7PHKU7F.[7] These funds are part of the **Defendant Property**.

49.    The North Korean actors next transferred virtual currency from certain other Solana blockchain addresses into the Allbridge Core blockchain bridging service, which converted the USDT within the Solana addresses into USDT on the Tron blockchain. Specifically, between March 17 and 19, 2024, approximately 477,172 USDT was moved from Cs2kjq and BAdMy9 (referenced

---

[7] Note that this address also received stolen funds from a different Tron address, as described below in paragraph 49(a).

in paragraphs 43(e) and (i) above) through the Allbridge Core service into Tron address TMNBaFNYA1DGBiDmZcEjU81kRyX8CrkoYJ ("TMNBa"). Nearly all of the USDT was withdrawn from Tron address TMNBa to other Tron addresses and exchange accounts prior to the U.S. government's freeze request to Tether, as described in Laundering Stage 3, below.

*Laundering Stage 3*

50.     The virtual currency not frozen at address TMNBa was sent from TMNBa to the following Tron addresses and frozen by Tether in a subsequent request made of the U.S. government, which constitutes funds that are part of the **Defendant Property**:

    a.  On or about March 19, 2024, approximately 129,550 USDT was moved directly into Tron address TRRNwZRbssAetYFAvvZ1bBoJbfh7PHKU7F ("TRRNwZ"). [8] Approximately 92,579 USDT was transferred from TRRNwZ to other addresses prior to the freeze request, leaving approximately 222,129 USDT within the wallet.

    b.  On or about March 19, 2024, approximately 161,516 USDT was moved into Tron address TV9VvDJtqKYK9strwr8L2hf9xTzvssNLBA ("TV9VvD"). Approximately 79,256 USDT was transferred from TV9VvD to other addresses prior to the freeze request, leaving approximately 82,260 USDT within the wallet.

51.     The North Korean actors also moved virtual currency from TRRNwZ to a deposit address at the OKX exchange. A portion of the virtual currency at this OKX deposit address was frozen by OKX at the request of the U.S. government, which is listed herein:

---

[8] Note that this address also received stolen funds from a Solana blockchain address, as described in paragraph 47(b), above.

a. On or about March 18, 2024, approximately 182,582 USDT was moved from the TRRNwZ address to Tron address TRGCZn18Y5FJ3Mi8F8LS3G7PSWoQui2h9f ("TRGCZ"), which was associated with the OKX exchange.

52. Approximately 90,501 USDT was withdrawn from the OKX address TRGCZ and transferred to other Tron addresses located at Binance prior to the U.S. government's freeze request. The virtual currency stored on these Tron addresses at Binance were proactively frozen by Binance and each of which is listed herein:

a. On or about March 18, 2024, approximately 11,512 USDT was withdrawn from TRGCZ the OKX exchange and deposited into Tron address TBpMpQ9cF6iYWk5vrFm8pn8wGAjKoCuJJ2, which was associated with the Binance exchange.

b. On or about March 18, 2024, approximately 9,675 USDT was withdrawn from TRGCZ the OKX exchange and deposited into Tron address TQnHK9iYA3xaLtVZgMBY96baBRsgAdpqGk, which was associated with the Binance exchange.

c. On or about March 18, 2024, approximately 69,314 USDT was withdrawn from TRGCZ the OKX exchange and deposited into Tron address TQo9feFwtMKR8Tz2xwsD1GmkJrD8ft9CP1, which was associated with the Binance exchange.

**Seizure of Stolen Funds (including the Defendant Property)**

38. On or about April 1, 2024, the FBI seized:

a. 69,889.537636 USDT (Solana) from Binance;

b. 142,463.870089 USDT (Tron) from Binance;

    c.  2,794.85 USDT (Tron) from OKX; and

    d.  **1,467,761.163191 USDT** (Tron) (the **Defendant Property**) from Tether.

39.    All of the above funds were transferred into an FBI-controlled virtual currency wallet.

40.    The Defendant Property remains in the possession of the FBI; this Verified Complaint for Forfeiture *In Rem* pertains only to the **1,467,761.163191 USDT** seized from Tether, as described above.

## COUNT ONE – FORFEITURE OF DEFENDANT PROPERTY

### (18 U.S.C. §§ 981(a)(1)(C) & 28 U.S.C. § 2461(c))

41.    Paragraphs 1 through 41 are realleged and incorporated herein by reference.

42.    The Defendant Property is property constituting or derived from proceeds traceable to identity theft, computer fraud, wire fraud, and conspiracy to commit computer fraud and wire fraud, in violation of 18 U.S.C. §§ 1028, 1030, 1343, 1349 and 371.

43.    Accordingly, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c).

## COUNT TWO – FORFEITURE OF DEFENDANT PROPERTY

### (18 U.S.C. § 981(a)(1)(A))

44.    Paragraphs 1 through 40 are realleged and incorporated herein by reference.

45.    The Defendant Property are property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and 1956(h), that is, a conspiracy to conduct or attempt to conduct financial transactions involving the proceeds of specified unlawful activity, to wit, computer fraud, wire fraud, conspiracy to commit computer fraud, and conspiracy to commit wire fraud, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity,

and knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

46.     Accordingly, the Defendant Property are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C).

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that this Honorable Court issue a warrant of arrest *in rem* according to law; that judgment be entered declaring that the Defendant Property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper.

January 6, 2025
Washington, D.C.

Respectfully submitted,


MATTHEW G. OLSEN

Assistant Attorney General
National Security Division
U.S. Department of Justice

SEAN M. NEWELL
Chief, National Security Cyber Section
National Security Division
U.S. Department of Justice

By:     */s/ Gregory Jon Nicosia, Jr.*
GREGORY JON NICOSIA, JR.
D.C. Bar No. 1033923
Trial Attorney
National Security Cyber Section
National Security Division
U.S. Department of Justice
D.C. Bar No. 1033923

950 Pennsylvania Avenue NW
Washington, D.C.  20530
Telephone: 202-353-4273

*/s/ Rick Blaylock, Jr.*
RICK BLAYLOCK, JR.
TX Bar No. 24103294
Assistant United States Attorney
Asset Forfeiture Coordinator
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-6765

**VERIFICATION**

I, Kyle M. McKnight, a Task Force Officer with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *in rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 6 day of January 2025.

Kyle M. McKnight
Task Force Officer
Federal Bureau of Investigation

**CIVIL COVER SHEET**

JS-44 (Rev. 11/2020 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| UNITED STATES OF AMERICA | APPROXIMATELY 1,467,761.163191 USDT |
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____ (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____ (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) Gregory Jon Nicosia, Jr. U.S. Department of Justice 950 Pennsylvania Avenue NW, Washington, DC 20530 (202) 353-4273 ⊞ | ATTORNEYS (IF KNOWN) |

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

- ⊙ 1 U.S. Government Plaintiff
- ○ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
**(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)**

○ **A.** *Antitrust*

- ☐ 410 Antitrust

○ **B.** *Personal Injury/ Malpractice*

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Product Liability

○ **C.** *Administrative Agency Review*

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D.** *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E.** *General Civil (Other)*      OR      ○ **F.** *Pro Se General Civil*

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 27 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Conditions
- ☐ 560 Civil Detainee – Conditions of Confinement

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent – Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016 (DTSA)

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☒ 690 Other

Other Statutes
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc
- ☐ 460 Deportation
- ☐ 462 Naturalization Application

- ☐ 465 Other Immigration Actions
- ☐ 470 Racketeer Influenced & Corrupt Organization
- ☐ 480 Consumer Credit
- ☐ 485 Telephone Consumer Protection Act (TCPA)
- ☐ 490 Cable/Satellite TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/Privacy Act* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus – General<br>☐ 510 Motion/Vacate Sentence<br>☐ 463 Habeas Corpus – Alien Detainee | ☐ 442 Civil Rights – Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loan (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 740 Labor Railway Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities – Employment<br>☐ 446 Americans w/Disabilities – Other<br>☐ 448 Education | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights – Voting (if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi-district Litigation ○ 7 Appeal to District Judge from Mag. Judge ○ 8 Multi-district Litigation – Direct File

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), and 28 U.S.C. § 2461(c)

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** _____<br>**JURY DEMAND:** | Check YES only if demanded in complaint<br>YES ☐    NO ☒ |
|---|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES ☐    NO ☒ | If yes, please complete related case form |
|---|---|---|---|

| **DATE:** _____ 01/06/2025 _____ | **SIGNATURE OF ATTORNEY OF RECORD** _____ /s/ Gregory Jon Nicosia, Jr. _____ |
|---|---|

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

**I.**    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

**III.**   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case.

**VI.**   CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**  RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# PETITION FOR REMISSION OR MITIGATION OF A CRIMINAL OR CIVIL FORFEITURE ACTION BY THE UNITED STATES DEPARTMENT OF JUSTICE

Note: This is a sample to assist potential petitioners. There is no legal form or format required for filing a petition. For more specific guidance on filing your petition, please consult Title 28, Code of Federal Regulations (C.F.R.) Section 9.4, which can be found at www.GPOaccess.gov.

To: The Attorney General of the United States

From: _____

_____

**(Name and address of petitioner or petitioner's attorney or representative)**

_____

**(Social Security Number / Taxpayer Identification Number of Petitioner)**

_____      _____

**Phone Number**                          **Email Address**

I am petitioning for the remission of the property described below because I am (check all that apply):

___ a victim of the crime underlying the forfeiture of the forfeited property, or related offense (*complete Sections I, III, and V*);

___ an owner of the forfeited property (*complete Sections I, II and V*); and/or

___ a lienholder of the forfeited property (*complete Sections I, II, and V*).

*If you would like to petition for the mitigation of the property (return of part of your interest in the property or return upon the imposition of certain conditions) because of extreme hardship, you must also complete Section IV.*

## SECTION I

Description of Property (*include specific information such as make, model, or serial numbers if applicable*):

_____
_____
_____

Seizing Agency: _____
Seizure Number/Asset ID Number: _____
Date and Place of Seizure: _____
**Court Case Information**

**Case Name:** _____
**Case Number:** _____
**Judicial District:** _____

## SECTION II

Request for Remission - Owner or Lienholder

*This section should be completed by persons claiming an ownership interest in the property.*

I am requesting remission of this forfeiture pursuant to 28 C.F.R. § 9.5(a) because I have a valid, good faith, and legally cognizable interest in the seized property as owner or lienholder as described below:

_____
_____
_____
_____
_____
_____

*Provide supporting documentation such as bills of sale, retail installment agreements, contracts, certificates of title, or mortgages.*

AND

1. ___ I am innocent within the meaning of the innocent owner standard as provided in Title 18 U.S. Code Section 983(d), because:

   ___ I did not know of the conduct giving rise to the forfeiture; or

   ___ Upon learning of the conduct giving rise to the forfeiture, I did all that reasonably could be expected under the circumstances to terminate such use of the property.

Please explain answer: _____
_____

OR

2. ___ I was a bona fide purchaser or seller of the forfeited property for value without cause to believe that the property was subject to forfeiture at the time of the offense underlying the forfeiture.

OR

3. ___ I held a legally cognizable interest in the forfeited property at the time of the offense underlying the forfeiture superior to that of the defendant.

Please explain answer 2 or 3: _____
_____
_____

## SECTION III

Non-Owner Victim's Explanation of Loss

*This section should be completed by victim petitioners only.*

___ I am requesting remission of this forfeiture because I am a victim of the criminal offense underlying the forfeiture of this property or am the victim of a related offense and I have suffered a pecuniary loss as a result of the offense that resulted in the forfeiture.

In the space provide below, please explain how you are a victim of the criminal offense, or a related offense, underlying the forfeiture of this property.  Be as specific as possible and provide details such as significant dates, names of individuals whom you dealt with, the amount of money you claim to have lost (including specifics of the transactions resulting in the loss), and any other information that you believe would be helpful in verifying your loss.  Please attach documentation of your loss (copies only), including receipts, invoices, bank statements, wire transfer confirmation statements and cancelled checks, to your petition.

**Do not attach your original documents to the petition.**

_____

_____

_____

_____

_____

_____

_____

_____

Total Amount of Pecuniary Loss Claimed: _____

**(Do not include collateral expenses such as attorney fees, investigative costs, lost wages. Do not include non-pecuniary harms such as pain and suffering, emotional distress, etc.)**

## SECTION IV

Petition for Mitigation of the Forfeiture

*This section need be completed only by owner and lienholder petitioners seeking alternative relief to complete remission of the property.*

In the event that the Ruling Official determines that I do not qualify for remission of the property, I hereby request mitigation of the forfeiture to avoid extreme hardship. In support of my request, I would like the Ruling Official to consider the following extenuating circumstances:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

## SECTION V

Declaration

*The declaration must be completed by all petitioners unless the petitioner is represented by an attorney. The attorney may complete the declaration if the petitioner completes the sworn notice of representation below.*

I understand that the information that I am providing in support of my petition will be relied upon for purposes of determining my right to receive a petition award. I hereby declare under penalty of perjury under the laws of the United States of America that I believe that the information I am providing in support of my petition is true and correct. I further certify that any documents I have submitted in support of my petition consist of unaltered copies of documents that are in my possession.

**Signature**

**Print Name**

**Date**

## Sworn Notice of Representation

*This section must be completed only by petitioners who are represented by an attorney and whose attorney has executed the declaration provided above.*

I have retained the attorney who has completed the Declaration in Section V to represent me in this matter. I have reviewed the foregoing petition and found that its contents are accurate to the best of my information and belief. I declare under penalty of perjury that the foregoing information is true and correct.

**Signature**

**Print Name**

**Date**

**The completed original petition for remission and all supporting documentation must be submitted to the United States Attorney for the judicial district in which the forfeiture proceedings took place. A copy of the petition for remission should be submitted to the seizing agency in the judicial district in which the seizure occurred.**

CODE OF FEDERAL REGULATIONS
TITLE 28--JUDICIAL ADMINISTRATION
CHAPTER I--DEPARTMENT OF JUSTICE
PART 9--REGULATIONS GOVERNING THE REMISSION OR MITIGATION OF CIVIL
AND CRIMINAL FORFEITURES

§ 9.1 Authority, purpose, and scope.

§ 9.2 Definitions.

§ 9.3 Petitions in administrative forfeiture cases.

§ 9.4 Petitions in judicial forfeiture cases.

§ 9.5 Criteria governing administrative and judicial remission and mitigation.

§ 9.6 Special rules for specific petitioners.

§ 9.7 Terms and conditions of remission and mitigation.

§ 9.8 Provisions applicable to victims.

§ 9.9 Miscellaneous Provisions.

### § 9.1 Authority, purpose, and scope.

(a) Purpose.  This part sets forth the procedures for agency officials to follow when considering remission or mitigation of administrative forfeitures under the jurisdiction of the agency, and civil judicial and criminal judicial forfeitures under the jurisdiction of the Criminal Division.  The purpose of the regulations in this part is to provide a basis for ameliorating the effects of forfeiture through the partial or total remission of forfeiture for individuals who have an interest in the forfeited property but who did not participate in, or have knowledge of, the conduct that resulted in the property being subject to forfeiture and, where required, took all reasonable steps under the circumstances to ensure that such property would not be used, acquired, or disposed of contrary to law.  Additionally, the regulations provide for partial or total mitigation of the forfeiture and imposition of alternative conditions in appropriate circumstances.

(b) Authority to grant remission and mitigation.

(1) Remission and mitigation functions in administrative forfeitures are performed by the agency seizing the property.  Within the Federal Bureau of Investigation, authority to grant remission and mitigation is delegated to the Forfeiture Counsel, who is the Unit Chief, Legal Forfeiture Unit, Office of the General Counsel;  within the Drug Enforcement Administration, authority to grant remission and mitigation is delegated to the Forfeiture Counsel, Office of Chief Counsel;  and within the Immigration and Naturalization Service, authority to grant remission and mitigation is delegated to the INS Regional Directors.

(2) Remission and mitigation functions in judicial cases are performed by the Criminal Division of the Department of Justice.  Within the Criminal Division, authority to grant remission and mitigation is delegated to the Chief, Asset Forfeiture and Money Laundering Section, Criminal Division.

(3) The powers and responsibilities delegated by these regulations in this part may be redelegated to attorneys or managers working under the supervision of the designated officials.

(c) The time periods and internal requirements established in this part are designed to guide the orderly administration of the remission and mitigation process and are not intended to create rights or entitlements in favor of individuals seeking remission or mitigation. The regulations will apply to all decisions on petitions for remission or mitigation made on or after February 3, 1997. The regulations will apply to decisions on requests for reconsideration of a denial of a petition under §§ 9.3(j) and 9.4(k) only if the initial decision on the petition was made under the provisions of this part effective on February 3, 1997.

(d) This part governs any petition for remission filed with the Attorney General and supersedes any Department of Justice regulation governing petitions for remission, to the extent such regulation is inconsistent with this part. In particular, this part supersedes the provisions of 21 CFR 1316.79 and 1316.80, which contain remission and mitigation procedures for property seized for narcotics violations. The provisions of 8 CFR 274.13 through 274.19 and 28 CFR 8.10, which concern non-drug related forfeitures, are also superseded by this part where those regulations relate to remission and mitigation.

## § 9.2 Definitions.

As used in this part:

(a) The term administrative forfeiture means the process by which property may be forfeited by an investigative agency rather than through judicial proceedings.

(b) The term appraised value means the estimated market value of an asset at the time and place of seizure if such or similar property was freely offered for sale between a willing seller and a willing buyer.

(c) The term Assets Forfeiture Fund means the Department of Justice Assets Forfeiture Fund or Department of the Treasury Asset Forfeiture Fund, depending upon the identity of the seizing agency.

(d) The term Attorney General means the Attorney General of the United States or his or her designee.

(e) The term beneficial owner means a person with actual use of, as well as an interest in, the property subject to forfeiture.

(f) The terms Chief, Asset Forfeiture and Money Laundering Section, and Chief, refer to the Chief of the Asset Forfeiture and Money Laundering Section, Criminal Division, United States Department of Justice.

(g) The term general creditor means one whose claim or debt is not secured by a specific right to obtain satisfaction against the particular property subject to forfeiture.

(h) The term judgment creditor means one who has obtained a judgment against the debtor but has not yet received full satisfaction of the judgment.

(i) The term judicial forfeiture means either a civil or a criminal proceeding in a United States District Court that may result in a final judgment and order of forfeiture.

(j) The term lienholder means a creditor whose claim or debt is secured by a specific right to obtain satisfaction against the particular property subject to forfeiture. A lien creditor qualifies as a lienholder

if the lien:

(1) Was established by operation of law or contract;

(2) Was created as a result of an exchange of money, goods, or services; and

(3) Is perfected against the specific property forfeited for which remission or mitigation is sought (e.g., a real estate mortgage; a mechanic's lien).

(k) The term net equity means the amount of a lienholder's monetary interest in property subject to forfeiture. Net equity shall be computed by determining the amount of unpaid principal and unpaid interest at the time of seizure, and by adding to that sum unpaid interest calculated from the date of seizure through the last full month prior to the date of the decision on the petition. Where a rate of interest is set forth in a security agreement, the rate of interest to be used in this computation will be the annual percentage rate so specified in the security agreement that is the basis of the lienholder's interest. In this computation, however, there shall be no allowances for attorneys' fees, accelerated or enhanced interest charges, amounts set by contract as damages, unearned extended warranty fees, insurance, service contract charges incurred after the date of seizure, allowances for dealer's reserve, or any other similar charges.

(l) The term owner means the person in whom primary title is vested or whose interest is manifested by the actual and beneficial use of the property, even though the title is vested in another. A victim of an offense, as defined in paragraph (v) of this section, may also be an owner if he or she has a present legally cognizable ownership interest in the property forfeited. A nominal owner of property will not be treated as its true owner if he or she is not its beneficial owner.

(m) The term person means an individual, partnership, corporation, joint business enterprise, estate, or other legal entity capable of owning property.

(n) The term petition means a petition for remission or mitigation of forfeiture under the regulations in this part. This definition includes a petition for restoration of the proceeds of sale of forfeited property and a petition for the value of forfeited property placed into official use.

(o) The term petitioner means the person applying for remission, mitigation, restoration of the proceeds of sale, or for the appraised value of forfeited property, under the regulations in this part. A petitioner may be an owner as defined in § 9.2(l), a lienholder as defined in § 9.2(j), or a victim as defined in § 9.2(v), subject to the limitations of § 9.8.

(p) The term property means real or personal property of any kind capable of being owned or possessed.

(q) The term record means a series of arrests for related crimes, unless the arrestee was acquitted or the charges were dismissed for lack of evidence; a conviction for a related crime or completion of sentence within ten years of the acquisition of the property subject to forfeiture; or two convictions for a related crime at any time in the past.

(r) The term related crime as used in § 9.2(q) and § 9.6(e) means any crime similar in nature to that which gives rise to the seizure of property for forfeiture. For example, where property is seized for a violation of the federal laws relating to drugs, a related crime would be any offense involving a violation of the federal laws relating to drugs or the laws of any state or political subdivision thereof relating to drugs.

(s) The term related offense as used in § 9.8 means:

(1) Any predicate offense charged in a Federal Racketeer Influenced and Corrupt Organizations Act (RICO) count for which forfeiture was ordered; or

(2) An offense committed as part of the same scheme or design, or pursuant to the same conspiracy, as was involved in the offense for which forfeiture was ordered.

(t) The term Ruling Official means any official to whom decision making authority has been delegated pursuant to § 9.1(b).

(u) The term seizing agency means the federal agency that seized the property or adopted the seizure of another agency for federal forfeiture.

(v) The term victim means a person who has incurred a pecuniary loss as a direct result of the commission of the offense underlying a forfeiture. A drug user is not considered a victim of a drug trafficking offense under this definition. A victim does not include one who acquires a right to sue the perpetrator of the criminal offense for any loss by assignment, subrogation inheritance, or otherwise form the actual victim, unless that person has acquired an actual ownership interest in the forfeited property.

(w) The term violator means the person whose use or acquisition of the property in violation of the law subjected such property to seizure for forfeiture.

## § 9.3 Petitions in administrative forfeiture cases.

(a) Notice of seizure. The notice of seizure and intent to forfeit the property shall advise any persons who may have a present ownership interest in the property to submit their petitions for remission or mitigation within thirty (30) days of the date they receive the notice in order to facilitate processing. Petitions shall be considered any time after notice until the forfeited property is placed into official use, sold, or otherwise disposed of according to law, except in cases involving petitions to restore the proceeds from the sale of forfeited property. A notice of seizure shall include the title of the seizing agency, the Ruling Official, the mailing and street address of the official to whom petitions should be sent, and an asset identifier number.

(b) Persons who may file. A petition for remission or mitigation must be filed by a petitioner as defined in § 9.2(o) or as prescribed in §§ 9.9(g) and (h).

(c) Contents of petition.

(1) All petitions must include the following information in clear and concise terms:

(i) The name, address, and social security or other taxpayer identification number of the person claiming an interest in the seized property who is seeking remission or mitigation;

(ii) The name of the seizing agency, the asset identifier number, and the date and place of seizure;

(iii) A complete description of the property, including make, model, and serial numbers, if any; and

(iv) A description of the petitioner's interest in the property as owner, lienholder, or otherwise, supported by original or certified bills of sale, contracts, deeds, mortgages, or other documentary

evidence.

(2) Any factual recitation or documentation of any type in a petition must be supported by a sworn affidavit.

(d) Releases. In addition to the contents of the petition for remission or mitigation set forth in paragraph (c) of this section, upon request, the petitioner shall also furnish the agency with an instrument executed by the titled or registered owner and any other known claimant of an interest in the property releasing interest in such property.

(e) Filing petition with agency.

(1) A petition for remission or mitigation subject to administrative forfeiture shall be addressed to the appropriate federal agency as follows:

(i) Drug Enforcement Administration, Office of Chief Counsel, Street Address:  700 Army Navy Drive, Arlington, VA 22202

Mailing Address:  P.O. Box 28356, Washington, D.C. 20038.

(ii) Federal Bureau of Investigation, Special Agent in Charge, Field Office that seized the property.

(iii) Immigration and Naturalization Service District Director, Chief Patrol Agent, or Regional Asset Forfeiture Office at location with jurisdiction over the forfeiture proceeding.

(2) The petition is to be sent to the official address provided in the notice of seizure and shall be sworn to by the petitioner or by the petitioner's attorney upon information and belief, supported by the client's sworn notice of representation pursuant to 28 U.S.C. 1746, as set out in § 9.9(g).  The Chief of the Asset Forfeiture and Money Laundering Section is delegated authority to amend the address of the official to whom petitions may be sent from time to time, as necessary, by publishing notice of the change of address in the Federal Register.  Failure to publish a notice of change of address in the Federal Register shall not alter the authority of the Ruling Official to determine petitions for remission or mitigation nor the obligation of a petitioner to file a petition at the address provided in the notice of seizure.  Failure to publish a notice of change of address in the Federal Register shall not be grounds for expanding the time for filing a petition for remission or mitigation under the regulations in this part.

(f) Agency investigation. Upon receipt of a petition, the seizing agency shall investigate the merits of the petition and prepare a written report containing the results of that investigation.  This report shall be submitted to the Ruling Official for review and consideration.

(g) Ruling. Upon receipt of the petition and the agency report, the Ruling Official for the seizing agency shall review the petition and the report, and shall rule on the merits of the petition.  No hearing shall be held.

(h) Petitions granted. If the Ruling Official grants a remission or mitigation of the forfeiture, a copy of the decision shall be mailed to the petitioner or, if represented by an attorney, to the petitioner's attorney. A copy shall also be sent to the United States Marshals Service or other property custodian.  The written decision shall include the terms and conditions, if any, upon which the remission or mitigation is granted and the procedures the petitioner must follow to obtain release of the property or the monetary interest therein.

(i) Petitions denied.  If the Ruling Official denies a petition, a copy of the decision shall be mailed to the petitioner or, if represented by an attorney, to the petitioner's attorney of record.  A copy of the decision shall also be sent to the United States Marshals Service or other property custodian.  The decision shall specify the reason that the petition was denied.  The decision shall advise the petitioner that a request for reconsideration of the denial of the petition may be submitted to the Ruling Official in accordance with paragraph (j) of this section.

(j) Request for reconsideration.

(1) A request for reconsideration of the denial of the petition shall be considered if:

(i) It is postmarked or received by the office of the Ruling Official within ten (10) days from the receipt of the notice of denial of the petition by the petitioner; and

(ii) The request is based on information or evidence not previously considered that is material to the basis for the denial or presents a basis clearly demonstrating that the denial was erroneous.

(2) In no event shall a request for reconsideration be decided by the same Ruling Official who ruled on the original petition.

(3) Only one request for reconsideration of a denial of a petition shall be considered.

(k) Restoration of proceeds from sale.

(1) A petition for restoration of the proceeds from the sale of forfeited property, or for the appraised value of forfeited property when the forfeited property has been retained by or delivered to a government agency for official use, may be submitted by an owner or lienholder in cases in which the petitioner:

(i) Did not know of the seizure prior to the entry of a declaration of forfeiture; and

(ii) Could not reasonably have known of the seizure prior to the entry of a declaration of forfeiture.

(2) Such a petition shall be submitted pursuant to paragraphs (b) through (e) of this section within ninety (90) days of the date the property is sold or otherwise disposed of.

## § 9.4 Petitions in judicial forfeiture cases.

(a) Notice of seizure.  The notice of seizure and intent to forfeit the property shall advise any persons who may have a present ownership interest in the property to submit their petitions for remission or mitigation within thirty (30) days of the date they receive the notice in order to facilitate processing. Petitions shall be considered any time after notice until such time as the forfeited property is placed in official use, sold, or otherwise disposed of according to law, except in cases involving petitions to restore property.  A notice of seizure shall include the title of the Ruling Official and the mailing and street address of the official to whom petitions should be sent, the name of the agency seizing the property, an asset identifier number, and the district court docket number.

(b) Persons who may file.  A petition for remission or mitigation must be filed by a petitioner as defined in § 9.2(o) or as prescribed in §§ 9.9 (g) and (h).

(c) Contents of petition.

(1) All petitions must include the following information in clear and concise terms:

(i) The name, address, and social security or other taxpayer identification number of the person claiming an interest in the seized property who is seeking remission or mitigation;

(ii) The name of the seizing agency, the asset identifier number, and the date and place of seizure;

(iii) The district court docket number;

(iv) A complete description of the property, including the address or legal description of real property, and make, model, and serial numbers of personal property, if any; and

(v) A description of the petitioner's interest in the property as owner, lienholder, or otherwise, supported by original or certified bills of sale, contracts, mortgages, deeds, or other documentary evidence.

(2) Any factual recitation or documentation of any type in a petition must be supported by a sworn affidavit.

(d) Releases. In addition to the content of the petition for remission or mitigation set forth in paragraph (c) of this section, the petitioner, upon request, also shall furnish the agency with an instrument executed by the titled or registered owner and any other known claimant of an interest in the property releasing the interest in such property.

(e) Filing petition with Department of Justice. A petition for remission or mitigation of a judicial forfeiture shall be addressed to the Attorney General; shall be sworn to by the petitioner or by the petitioner's attorney upon information and belief, supported by the client's sworn notice of representation pursuant to 28 U.S.C. 1746, as set forth in § 9.9(g); and shall be submitted to the United States Attorney for the district in which the judicial forfeiture proceedings are brought. A petitioner also shall submit a copy of the petition to the seizing agency in the judicial district in which the seizure occurred as specified in the notice of seizure, except in Drug Enforcement Administration cases, where the copy shall be submitted to Drug Enforcement Administration Headquarters, Office of Chief Counsel, P.O. Box 28356, Washington, D.C. 20038, or 700 Army Navy Drive, Arlington, VA 22202.

(f) Agency investigation and recommendation; United States Attorney's recommendation. Upon receipt of a petition, the United States Attorney shall direct the seizing agency to investigate the merits of the petition based on the information provided by the petitioner and the totality of the agency's investigation of the underlying basis for forfeiture. The agency shall submit to the United States Attorney a report of its investigation and its recommendation on whether the petition should be granted or denied. Upon receipt of the agency's report and recommendation, the United States Attorney shall forward to the Chief, Asset Forfeiture and Money Laundering Section, the petition, the seizing agency's report and recommendation, and the United States Attorney's recommendation on whether the petition should be granted or denied.

(g) Ruling. The Chief shall rule on the petition. No hearing shall be held. The Chief shall not rule on any petition in any case in which similar petition has been administratively denied by the seizing agency prior to the referral of the case to the United States Attorney for the institution of forfeiture proceedings.

(h) Petitions under Internal Revenue Service liquor laws. The Chief shall accept and consider petitions submitted in judicial forfeiture proceedings under the Internal Revenue Service liquor laws only prior to

the time a decree of forfeiture is entered. Thereafter, district courts have exclusive jurisdiction.

(i) Petitions granted. If the Chief grants a remission or mitigates the forfeiture, the Chief shall mail a copy of the decision to the petitioner or, if represented by an attorney, to the petitioner's attorney, the appropriate United States Attorney, the United States Marshals Service or other property custodian, and the appropriate seizing agency. The written decision shall include the terms and conditions, if any, upon which the remission or mitigation is granted and the procedures the petitioner must follow to obtain release of the property or the monetary interest therein. The Chief shall advise the petitioner or the petitioner's attorney to consult with the United States Attorney as to such terms and conditions. The United States Attorney shall confer with the seizing agency regarding the release and shall coordinate disposition of the property with that office and the United States Marshals Service or other property custodian.

(j) Petitions denied. If the Chief denies a petition, a copy of that decision shall be mailed to the petitioner, or if represented by an attorney, to the petitioner's attorney of record, to the appropriate United States Attorney, the United States Marshals Service or other property custodian, and to the appropriate seizing agency. The decision shall specify the reason that the petition was denied. The decision shall advise the petitioner that a request for reconsideration of the denial of the petition may be submitted to the Chief at the address provided in the decision, in accordance with paragraph (k) of this section.

(k) Request for reconsideration.

(1) A request for reconsideration of the denial shall be considered if:

(i) It is postmarked or received by the Asset Forfeiture and Money Laundering Section at the address contained in the decision denying the petition within ten (10) days from the receipt of the notice of denial of the petition by the petitioner; and

(ii) The request is based on information or evidence not previously considered that is material to the basis for the denial or presents a basis clearly demonstrating that the denial was erroneous. A copy of the request must be received by the appropriate United States Attorney within ten (10) days of the receipt of the denial by the petitioner.

(2) In no event shall a request for reconsideration be decided by the Ruling Official who ruled on the original petition.

(3) Only one request for reconsideration of a denial of a petition shall be considered.

(4) Upon receipt of the request for reconsideration of the denial of a petition, disposition of the property will be delayed pending notice of the decision at the request of the Chief. If the United States Attorney does not receive a copy of the request for reconsideration within the prescribed period, the deposition of the property may proceed.

(l) Restoration of Proceeds from sale.

(1) A petition for restoration of the proceeds from the sale of forfeited property, or for the appraised value of forfeited property when the forfeited property has been retained by or delivered to a government agency for official use, may be submitted by an owner or lienholder in cases in which the petitioner:

(i) Did not know of the seizure prior to the entry of a final order of forfeiture; and

(ii) Could not reasonably have known of the seizure prior to the entry of a final order of forfeiture.

(2) Such a petition must be submitted pursuant to paragraphs (b) through (e) of this section within ninety (90) days of the date the property was sold or otherwise disposed of.

### § 9.5 Criteria governing administrative and judicial remission and mitigation.

(a) Remission.

(1) The Ruling Official shall not grant remission of a forfeiture unless the petitioner establishes that:

(i) The petitioner has a valid, good faith, and legally cognizable interest in the seized property as owner or lienholder as defined in this part; and

(ii) The petitioner is innocent within the meaning of the innocent owner provisions of the applicable civil forfeiture statute, is a bona fide purchaser for value without cause to believe that the property was subject to forfeiture at the time of the purchase, or is one who held a legally cognizable interest in the seized property at the time of the violation underlying the forfeiture superior to that of the defendant within the meaning of the applicable criminal forfeiture statute, and is thereby entitled to recover his or her interest in the forfeited property by statute. (If the applicable civil forfeiture statute contains no innocent owner defense, the innocent owner provisions applicable to 21 U.S.C. 881(a)(4) shall apply.) Unless otherwise provided by statute, in the case of petitioners who acquired their interest in the property after the time of the violation underlying the forfeiture, the question of whether the petitioner had knowledge of the violation shall be determined as of the point in time when the interest in the property was acquired.

(2) The knowledge and responsibilities of petitioner's representative, agent, or employee in paragraph (a)(1)(ii) of this section are imputed to the petitioner where the representative, agent, or employee was acting in the course of his or her employment and in furtherance of the petitioner's business.

(3) The petitioner has the burden of establishing the basis for granting a petition for remission or mitigation of forfeited property, a restoration of proceeds of sale or appraised value of forfeited property, or a reconsideration of a denial of such a petition. Failure to provide information or documents and to submit to interviews, as requested, may result in a denial of the petition.

(4) The Ruling Official shall presume a valid forfeiture and shall not consider whether the evidence is sufficient to support the forfeiture.

(5) Willful, materially-false statements or information, made or furnished by the petitioner in support of a petition for remission or mitigation of forfeited property, the restoration of proceeds or appraised value of forfeited property, or the reconsideration of a denial of any such petition, shall be grounds for denial of such petition and possible prosecution for the filing of false statements.

(b) Mitigation.

(1) The Ruling Official may grant mitigation to a party not involved in the commission of the offense underlying forfeiture:

(i) Where the petitioner has not met the minimum conditions for remission, but the Ruling Official finds that some relief should be granted to avoid extreme hardship, and that return of the property

combined with imposition of monetary and/or other conditions of mitigation in lieu of a complete forfeiture will promote the interest of justice and will not diminish the deterrent effect of the law. Extenuating circumstances justifying such a finding include those circumstances that reduce the responsibility of the petitioner for knowledge of the illegal activity, knowledge of the criminal record of a user of the property, or failure to take reasonable steps to prevent the illegal use or acquisition by another for some reason, such as a reasonable fear of reprisal; or

(ii) Where the minimum standards for remission have been satisfied but the overall circumstances are such that, in the opinion of the Ruling Official, complete relief is not warranted.

(2) The Ruling Officials may in his or her discretion grant mitigation to a party involved in the commission of the offense underlying the forfeiture where certain mitigating factors exist, including, but not limited to: the lack of a prior record or evidence of similar criminal conduct; if the violation does not include drug distribution, manufacturing, or importation, the fact that the violator has taken steps, such as drug treatment, to prevent further criminal conduct; the fact that the violation was minimal and was not part of a larger criminal scheme; the fact that the violator has cooperated with federal, state, or local investigations relating to the criminal conduct underlying the forfeiture; or the fact that complete forfeiture of an asset is not necessary to achieve the legitimate purposes of forfeiture.

(3) Mitigation may take the form of a monetary condition or the imposition of other conditions relating to the continued use of the property, and the return of the property, in addition to the imposition of any other costs that would be chargeable as a condition to remission. This monetary condition is considered as an item of cost payable by the petitioner, and shall be deposited into the Assets Forfeiture Fund as an amount realized from forfeiture in accordance with the applicable statute. If the petitioner fails to accept the Ruling Official's mitigation decision or any of its conditions, or fails to pay the monetary amount within twenty (20) days of the receipt of the decision, the property shall be sold, and the monetary amount imposed and other costs chargeable as a condition to mitigation shall be subtracted from the proceeds of the sale before transmitting the remainder to the petitioner.

### § 9.6 Special rules for specific petitioners.

(a) General creditors. A general creditor may not be granted remission or mitigation of forfeiture unless he or she otherwise qualifies as petitioner under this part.

(b) Rival claimants. If the beneficial owner of the forfeited property and the owner of a security interest in the same property each files a petition, and if both petitions are found to be meritorious, the claims of the beneficial owner shall take precedence.

(c) Voluntary bailments. A petitioner who allows another to use his or her property without cost, and who is not in the business of lending money secured by property or of leasing or renting property for profit, shall be granted remission or mitigation of forfeiture in accordance with the provisions of § 9.5.

(d) Lessors. A person engaged in the business of leasing or renting real or personal property on a long-term basis with the right to sublease shall not be entitled to remission or mitigation of a forfeiture of such property unless the lessor can demonstrate compliance with all the requirements of § 9.5.

(e) Straw owners. A petition by any person who has acquired a property interest recognizable under this part, and who knew or had reason to believe that the interest was conveyed by the previous owner for the purpose of circumventing seizure, forfeiture, or the regulations in this part, shall be denied. A petition by a person who purchases or owns property for another who has a record for related crimes as defined in §

9.2(r), or a petition by a lienholder who knows or has reason to believe that the purchaser or owner of record is not the real purchaser or owner, shall be denied unless both the purchaser of record and the real purchaser or owner meet the requirements of § 9.5.

(f) Judgment creditors.

(1) A judgment creditor will be recognized as a lienholder if:

(i) The judgment was duly recorded before the seizure of the property for forfeiture;

(ii) Under applicable state or other local law, the judgment constitutes a valid lien on the property that attached to it before the seizure of the property for forfeiture; and

(iii) The petitioner had no knowledge of the commission of any act or acts giving rise to the forfeiture at the time the judgment became a lien on the forfeited property.

(2) A judgment creditor will not be recognized as a lienholder if the property in question is not property of which the judgment debtor is entitled to claim ownership under applicable state or other local law (e.g., stolen property). A judgment creditor is entitled under this part to no more than the amount of the judgment, exclusive of any interest, costs, or other fees including attorney's fees associated with the action that led to the judgment or its collection.

(3) A judgment creditor's lien must be registered in the district where the property is located if the judgment was obtained outside the district.

### § 9.7 Terms and conditions of remission and mitigation.

(a) Owners.

(1) An owner's interest in property that has been forfeited is represented by the property itself or by a monetary interest equivalent to that interest at the time of seizure. Whether the property or a monetary equivalent will be remitted to an owner shall be determined at the discretion of the Ruling Official.

(2) If a civil judicial forfeiture action against the property is pending, release of the property must await an appropriate court order.

(3) Where the government sells or disposes of the property prior to the grant of the remission, the owner shall receive the proceeds of that sale, less any costs incurred by the government in the sale. The Ruling Official, at his or her discretion, may waive the deduction of costs and expenses incident to the forfeiture.

(4) Where the owner does not comply with the conditions imposed upon release of the property by the Ruling Official, the property shall be sold. Following the sale, the proceeds shall be used to pay all costs of the forfeiture and disposition of the property, in addition to any monetary conditions imposed. The remaining balance shall be paid to the owner.

(b) Lienholders.

(1) When the forfeited property is to be retained for official use or transferred to a state or local law enforcement agency or foreign government pursuant to law, and remission or mitigation has been granted to a lienholder, the recipient of the property shall assure that:

(i) In the case of remission, the lien is satisfied as determined through the petition process; or

(ii) In the case of mitigation, an amount equal to the net equity, less any monetary conditions imposed, is paid to the lienholder prior to the release of the property to the recipient agency of foreign government.

(2) When the forfeited property is not retained for official use or transferred to another agency or foreign government pursuant to law, the lienholder shall be notified by the Ruling Official of the right to select either of the following alternatives:

(i) Return of property. The lienholder may obtain possession of the property after paying the United States, through the Ruling Official, the costs and expenses incident to the forfeiture, the amount, if any, by which the appraised value of the property exceeds the lienholder's net equity in the property, and any amount specified in the Ruling Official's decision as a condition to remit the property. The Ruling Official, at his or her discretion, may waive costs and expenses incident to the forfeiture. The Ruling Official shall forward a copy of the decision, a memorandum of disposition, and the original releases to the United States Marshals Service or other property custodian who shall thereafter release the property to the lienholder; or

(ii) Sale of Property and Payment to Lienholder. Subject to the provisions of § 9.9(a), upon sale of the property, the lienholder may receive the payment of a monetary amount up to the sum of the lienholder's net equity, less the expenses and costs incident to the forfeiture and sale of the property, and any other monetary conditions imposed. The Ruling Official, at his or her discretion, may waive costs and expenses incident to the forfeiture.

(3) If the lienholder does not notify the Ruling Official of the selection of one of the two options set forth in paragraph (b)(2) of this section within twenty (20) days of the receipt of notification, the Ruling Official shall direct the United States Marshal or other property custodian to sell the property and pay the lienholder an amount up to the net equity, less the costs and expenses incurred incident to the forfeiture and sale, and any monetary conditions imposed. In the event a lienholder subsequently receives a payment of any kind on the debt owed for which he or she received payment as a result of the granting of remission or mitigation, the lienholder shall reimburse the Assets Forfeiture Fund to the extent of the payment received.

(4) Where the lienholder does not comply with the conditions imposed upon the release of the property, the property shall be sold after forfeiture. From the proceeds of the sale, all costs incident to the forfeiture and sale shall first be deducted, and the balance up to the net equity, less any monetary conditions, shall be paid to the lienholder.

## § 9.8 Provisions applicable to victims.

The provisions of this section apply to victims of an offense underlying the forfeiture of property, or of a related offense, who do not have a present ownership interest in the forfeited property (or, in the case of multiple victims of an offense, who do not have a present ownership interest in the forfeited property that is clearly superior to that of other petitioner victims). The provisions of this section apply only with respect to property forfeited pursuant to statutes that explicitly authorize restoration or remission of forfeited property to victims. Victims who have a superior present legally cognizable ownership interest in forfeited property may file petitions, as other owners, subject to the regulations set forth in § 9.7(a). The claims of such owner victims, like those of any other owners, shall have priority over the claims of any non-owner victims whose claims are recognized pursuant to this section.

(a) Qualification to file. A victim, as defined in § 9.2(v), of an offense that was the underlying basis for the criminal, civil, or administrative forfeiture of specific property, or a victim of a related offense, may be granted remission of the forfeiture of that property, if in addition to complying with the other applicable provisions of § 9.8, the victim satisfactorily demonstrates that:

(1) A pecuniary loss of a specific amount has been directly caused by the criminal offense, or related offense, that was the underlying basis for the forfeiture, and that the loss is supported by documentary evidence including invoices and receipts;

(2) The pecuniary loss is the direct result of the illegal acts and is not the result of otherwise lawful acts that were committed in the course of a criminal offense;

(3) The victim did not knowingly contribute to, participate in, benefit from, or act in a willfully blind manner towards the commission of the offense, or related offense, that was the underlying basis of the forfeiture;

(4) The victim has not in fact been compensated for the wrongful loss of the property by the perpetrator or others;  and

(5) The victim does not have recourse reasonably available to other assets from which to obtain compensation for the wrongful loss of the property.

(b) Pecuniary loss. The amount of the pecuniary loss suffered by a victim for which remission may be granted is limited to the fair market value of the property of which the victim was deprived as of the date of the occurrence of the loss. No allowance shall be made for interest foregone or for collateral expenses incurred to recover lost property or to seek other recompense.

(c) Torts. A tort associated with illegal activity that formed the basis for the forfeiture shall not be a basis for remission, unless it constitutes the illegal activity itself, nor shall remission be granted for physical injuries to a petitioner or for damage to a petitioner's property.

(d) Denial of petition. In the exercise of his or her discretion, the Ruling Official may decline to grant remission where:

(1) There is substantial difficulty in calculating the pecuniary loss incurred by the victim or victims;

(2) The amount of the remission, if granted, would be small compared with the amount of expenses incurred by the government in determining whether to grant remission;  or

(3) The total number of victims is large and the monetary amount of the remission so small as to make its granting impractical.

(e) Pro rata basis. In granting remission to multiple victims pursuant to this section, the Ruling Official should generally grant remission on a pro rata basis to recognized victims when petitions cannot be granted in full due to the limited value of the forfeited property. However, the Ruling Official may consider, among others, the following factors in establishing appropriate priorities in individual cases:

(1) The specificity and reliability of the evidence establishing a loss;

(2) The fact that a particular victim is suffering an extreme financial hardship;

(3) The fact that a particular victim has cooperated with the government in the investigation related to the forfeiture or to a related persecution or civil action; and

(4) In the case of petitions filed by multiple victims of related offenses, the fact that a particular victim is a victim of the offense underlying the forfeiture.

(f) Reimbursement.  Any petitioner granted remission pursuant to this part shall reimburse the Assets Forfeiture Fund for the amount received to the extent the individual later receives compensation for the loss of the property from any other source.  The petitioner shall surrender the reimbursement upon payment from any secondary source.

(g) Claims of financial institution regulatory agencies.  In cases involving property forfeitable under 18 U.S.C. 981(a)(1)(C) or (a)(1)(D), the Ruling Official may decline to grant a petition filed by a petitioner in whole or in part due to the lack of sufficient forfeitable funds to satisfy both the petition and claims of the financial institution regulatory agencies pursuant to 18 U.S.C. 981(e)(3) or (7).  Generally, claims of financial institution regulatory agencies pursuant to 18 U.S.C. 981(e)(3) or (7) shall take priority over claims of victims.

### § 9.9 Miscellaneous Provisions.

(a) Priority of payment.  Except where otherwise provided in this part, costs incurred by the United States Marshals Service and other agencies participating in the forfeiture that were incident to the forfeiture, sale, or other disposition of the property shall be deducted from the amount available for remission or mitigation.  Such costs include, but are not limited to, court costs, storage costs, brokerage and other sales-related costs, the amount of any liens and associated costs paid by the government on the property, costs incurred in paying the ordinary and necessary expenses of a business seized for forfeiture, awards for information as authorized by statute, expenses of trustees or other assistants pursuant to paragraph (c) of this section, investigative or prosecutive costs specially incurred incident to the particular forfeiture, and costs incurred incident to the processing of the petition(s) for remission or mitigation.  The remaining balance shall be available for remission or mitigation.  The Ruling Official shall direct the distribution of the remaining balance in the following order or priority, except that the Ruling Official may exercise discretion in determining the priority between petitioners belonging to classes described in paragraphs (a)(3) and (4) of this section in exceptional circumstances:

(1) Owners;

(2) Lienholders;

(3) Federal financial institution regulatory agencies (pursuant to paragraph (e) of this section), not constituting owners or lienholders;  and

(4) Victims not constituting owners or lienholders (pursuant to § 9.8).

(b) Sale or disposition of property prior to ruling.  If forfeited property has been sold or otherwise disposed of prior to a ruling, the Ruling Official may grant relief in the form of a monetary amount.  The amount realized by the sale of the property is presumed to be the value of the property.  Monetary relief shall not be greater than the appraised value of the property at the time of seizure and shall not exceed the amount realized from the sale or other disposition.  The proceeds of the sale shall be distributed as follows:

(1) Payment of the government's expenses incurred incident to the forfeiture and sale, including court costs and storage charges, if any;

(2) Payment to the petitioner of an amount up to his or her interest in the property;

(3) Payment to the Assets Forfeiture Fund of all other costs and expenses incident to the forfeiture;

(4) In the case of victims, payment of any amount up to the amount of his or her loss;  and

(5) Payment of the balance remaining, if any, to the Assets Forfeiture Fund.

(c) Trustees and other assistants.  In the exercise of his or her discretion, the Ruling Official, with the approval of the Asset Forfeiture and Money Laundering Section, may use the services of a trustee, other government official, or appointed contractors to notify potential petitioners, process petitions, and make recommendations to the Ruling Official on the distribution of property to petitioners. The expense for such assistance shall be paid out of the forfeited funds.

(d) Other agencies of the United States.  Where another agency of the United States is entitled to remission or mitigation of forfeited assets because of an interest that is recognizable under this part or is eligible for such transfer pursuant to 18 U.S.C. 981(e)(6), such agency shall request the transfer in writing, in addition to complying with any applicable provisions of §§ 9.3 through 9.5.  The decision to make such transfer shall be made in writing by the Ruling Official.

(e) Financial institution regulatory agencies.  A Ruling Official may direct the transfer of property under 18 U.S.C. 981(e) to certain federal financial institution regulatory agencies or an entity acting in their behalf, upon receipt of a written request, in lieu of ruling on a petition for remission or mitigation.

(f) Transfers to foreign governments.  A Ruling Official may decline to grant remission to any petitioner other than an owner or lienholder so that forfeited assets may be transferred to a foreign government pursuant to 18 U.S.C. 981(i)(1), 19 U.S.C. 1616a(c)(2), or 21 U.S.C. 881(e)(1)(E).

(g) Filing by attorneys.

(1) A petition for remission or mitigation may be filed by a petitioner or by his or her attorney or legal guardian.  If an attorney files on behalf of the petitioner, the petition must include a signed and sworn statement by the client-petitioner stating that:

(i) The attorney has the authority to represent the petitioner in this proceeding;

(ii) The petitioner has fully reviewed the petition;  and

(iii) The petition is truthful and accurate in every respect.

(2) Verbal notification of representation is not acceptable.  Responses and notification of rulings shall not be sent to an attorney claiming to represent a petitioner unless a written notice of representation is filed.  No extensions of time shall be granted due to delays in submission of the notice of representation.

(h) Consolidated petitions.  At the discretion of the Ruling Official in individual cases, a petition may be filed by one petitioner on behalf of other petitioners, provided the petitions are based on similar underlying facts, and the petitioner who files the petition has written authority to do so on behalf of the

other petitioners. This authority must be either expressed in documents giving the petitioner the authority to file petitions for remission, or reasonably implied from documents giving the petitioner express authority to file claims or lawsuits related to the course of conduct in question on behalf of these petitioners. An insurer or an administrator of an employee benefit plan, for example, which itself has standing to file a petition as a "victim" within the meaning of § 9.2(v), may also file a petition on behalf of its insured or plan beneficiaries for any claims they may have based on co-payments made to the perpetrator of the offense underlying the forfeiture or the perpetrator of a "related offense" within the meaning of § 9.2(s), if the authority to file claims or lawsuits is contained in the document or documents establishing the plan. Where such a petition is filed, any amounts granted as a remission must be transferred to the other petitioners, not the party filing the petition; although, in his or her discretion, the Ruling Official may use the actual petitioner as an intermediary for transferring the amounts authorized as a remission to the other petitioners.